JOHN BERG, Executor and Sole Legatee of ROSA-
LIE BERG, v. AUGUST MOREAU, Executor
and Heir of FRANCIS MOREAU, Appellant.

**Division One, November 21, 1906.**

1. **WILL: Changes in Extremis: Omitting Pious Bequests.** An
omission from testator's will, an old man, made as the shadows
of death were deepening about him, of a bequest of seventy-
five dollars bequeathed by a former will, made a short time
previously, for the pious purpose of masses for his dead wife,
son and daughter, out of an estate of more than $12,000, all
of which was given by the last will to an only son over fifty-
seven years old, is suspicious and is to be considered in deter-
mining whether the last will was in fact the result of the undue
influence of some friends of the son who visited him at the time
the last will was drawn and executed.

2. **SPECIFIC PERFORMANCE: Oral Contract: Statute of Frauds:
Purpose.** Equity will not permit the Statute of Frauds as a de-
fense, when to allow that defense would be itself to commit
a fraud against the promisee who has performed the oral con-
tract. The purpose of the statute was not that it should be used
as an aid to perpetrate a fraud. Equity does not destroy it when
it steps in and prevents its use to inflict a fraud, but aids in
fulfilling it.

3. ———: ———: ———: **Proof.** The owner of 5.3 acres of land,
on which in a plain house he lived, worth $1,000 or more, 79
years old, his wife and all his children dead except one son,
57 years old, from whom he had been estranged, somewhat
feeble but leading an active life, agreed one year before his
death with a woman that if she and her husband would come
and live with him during the remainder of his life and if she
would take care of him, minister to his wants and nurse him
in sickness, he would give her, by deed or will, the homestead
and the personal property in the house. He had also 85 acres
of land nearby worth $10,000 and notes amounting to $2,000.
There was no conflict in the testimony that such was the agree-
ment, and that he was not to compensate her in money and
that she performed the agreement fully and faithfully on her
part. Eleven days before he died he made a will in harmony
with the agreement, but eight days later he was visited by
friends of the son and then made another will in which he
gave to her the furniture in the house and the use of the home-
stead for two years, and she now sues for a specific perform-

ance of the agreement. *Held,* that all the rules upon which the right of specific performance of an oral contract to make a will devising real estate in return for promises to be kept and covenants to be performed by the promisee, depends, were met and fully established, and the contract should be specifically enforced.

4. ————: **Monetary Value of Services.** The fact that the services rendered were of less monetary value than the property promised, is of small moment in a court of chancery called upon to enforce the contract on behalf of a promisee who has faithfully performed it on her part. There are things of more value than money. The thoughtful ministrations of a woman to an old man may be. And besides, the terms of the contract itself should control, unless unconscionable.

5. ————: **Humble Condition of Promisee.** A contract made with a lowly and humble person, devoted to menial employments, is as sacred in the eyes of the law as one made with a promisee seated in a high place.

6. ————: **Less Burdensome Than Contemplated.** And the fact that the burden which the promisee assumed was lighter than contemplated, in that the promisor did not live as long as was expected, is no reason that the contract should not be performed according to its terms.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney,* Judge.

AFFIRMED.

*Wm. F. Broadhead* and *R. H. Stevens* for appellant.

(1) To specifically enforce a verbal contract to convey land or to make a will devising land or bequeathing personalty, the contract must be established by clear, definite, unequivocal proof leaving no room for a reasonable doubt. If the terms are uncertain or ambiguous, or if not made out by satisfactory proof leaving no room for a reasonable doubt, specific performance will be refused. Gibbs v. Whitwell, 164 Mo. 391; Berry v. Hartzell, 91 Mo. 132; Rogers v. Wolfe, 104 Mo. 1; Railroad v. McCarthy, 97 Mo. 214; Sitton v. Shipp, 65

Mo. 297; Kinney v. Murray, 170 Mo. 674; Viers v. Viers, 175 Mo. 444; Steele v. Steele, 161 Mo. 575; Goodin v. Goodin, 172 Mo. 40; Alexander v. Alexander, 150 Mo. 579. (2) Statements, admissions and loose declarations of the party are insufficient to establish the contract charged. Underwood v. Underwood, 48 Mo. 527; Johnson v. Quarles, 46 Mo. 427; Rogers v. Wolfe, 104 Mo. 1; Sitton v. Shipp, 65 Mo. 297; Berry v. Hartzell, 91 Mo. 132; Teats v. Flanders, 118 Mo. 669; Kinney v. Murray, 170 Mo. 674. (3) Having laid down the rule that the proof of the contract must be such as to leave no room for a reasonable doubt, the rule is further established with reference to performance or part performance, that "there must be like proof that the acts performed refer to and result from the agreement, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance." "There must be no uncertainty or equivocation in the case." Rogers v. Wolfe, 104 Mo. 10; Sitton v. Shipp, 65 Mo. 297; Emmel v. Hayes, 102 Mo. 186; Ellis v. Railroad, 51 Mo. 200; Gibbs v. Whitwell, 164 Mo. 387; Underwood v. Underwood, 48 Mo. 527; Alexander v. Alexander, 150 Mo. 579. (4) Enforcement of specific performance is not a matter of absolute right; it rests in the sound discretion of the chancellor, to be governed by the circumstances, and will not be granted if unjust, unconscionable or inequitable, or if it would work a hardship or injustice to enforce it, and it is unjust to allow $1,600 worth of property for services shown to be worth $257. Pomeroy v. Fullerton, 131 Mo. 594; Sease v. Cleveland Co., 141 Mo. 488; Vieth v. Gierth, 92 Mo. 97; Fish v. Lightner, 44 Mo. 272; Taylor v. Williams, 45 Mo. 83; Durretts v. Hook, 8 Mo. 382; McElroy v. Maxwell, 101 Mo. 294; Waterman on Spec. Per., pp. 305-306; Brown, Exrx., v. Massey, 138 Mo. 519; In re Ferguson Estate, 124 Mo. 583; Railroad v. Curtis, 154 Mo. 10; Shinkle v. Vickery, 156 Mo. 10. (5) There was no con-

tract established by legal or sufficient proof, nor any ratification of the contract alleged nor part performance shown by sufficient evidence, and the pleas of the Statute of Frauds should prevail. (6) The plaintiff has an adequate and complete remedy at law either by the proof and allowance of the claim in the probate court against the Moreau estate, which is ample to meet all claims, or by the acceptance of the provisions made in the last will amounting in value to $340, to pay for services valued, according to the testimony, at about $257.

*Geo. W. Wolff* for respondent.

(1) The oral contract or promise sued on was established by proof sufficiently clear, definite and unequivocal, as to leave no room for reasonable doubt in the mind of the chancellor; nor is there any uncertainty or ambiguity in its terms; thus fully measuring up to the test and standard required in cases of this character. And such evidence may consist in declarations and acts of decedent with their attending circumstances. Steele v. Steele, 161 Mo. 575. (2) The admissions and declarations supporting the promise or agreement, as shown by the evidence, were not of that character usually condemned by the authorities because of their vagueness and indefiniteness, or remoteness as to time; they were clear, positive and convincing and all quite recently made and backed up and fortified by the old man's first will. (a) It is well established that an oral gift or promise may be proven by declarations of donor. Such promise need not be in writing, but it is sufficient if made orally; nor need such promise be clothed in technical and precise terms, but is sufficient if no doubt remains as to promisor's intentions to promisee. Sutton v. Hayden, 62 Mo. 101; Steele v. Steele, 161 Mo. 575. (b) The paper of February 3, 1902 (or first will), was properly admissible in evi-

dence, not as showing a contract, but by way of ratification, and as showing the old man's then fixed purpose and intent. Hiatt v. Williams, 72 Mo. 214; Thompson v. Ish, 99 Mo. 160; Lillard v. Wilson, 178 Mo. 158. (c) An expressed intention to give is but little short of a promise to give, and when acted upon by the intended donee, to his or her disadvantage, with the knowledge of the donor, the effect of a promise should be given to it. Hubbard v. Hubbard, 140 Mo. 308. (d) Where services are rendered, or a beneficial act is done, the subsequent assent of the beneficiary will be sufficient evidence to authorize the finding of a previous request. Kurr v. Cusenbury, 60 Mo. App. 558. (3) The services rendered (which are conceded) are referable solely to and result from the agreement. The same proof which has left no room for reasonable doubt as to the latter, has clearly established the former. All the facts and circumstances in the case, the condition and situation of the parties, corroborates and sustains the theory of respondent's case. (4) Appellant's plea of the Statute of Frauds can be of no avail, as either part or (as in this case) full performance on part of promise is sufficient to prevent its operation. Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; West v. Bundy, 78 Mo. 407; Sharkey v. McDermott, 91 Mo. 647; Hall v Harris, 145 Mo. 621; Green v. Ditsch, 143 Mo. 1; Alexander v. Alexander, 150 Mo. 599; Koch v. Hebel, 32 Mo. App. 103; Marks v. Davis, 72 Mo. App. 557; Chenoweth v. Pac. Ex. Co., 93 Mo. App. 185. (5) Whilst enforcement of specific performance is not a matter of absolute right and rests in the sound discretion of the chancellor, there is no reason why respondent should be relegated to her action at law to recover for the value of her services; there is nothing unjust, unconscionable or inequitable in the contract, nor will its enforcement work a hardship and injustice upon appellant, as claimed; in view of all the circumstances of the case, the value

of the whole estate, the situation of the parties, etc., the contract was a fair, just and equitable one, and having been fully performed upon the one side should be performed upon the other. Wright v. Tinsley, 30 Mo. 389; Gupton v. Gupton, 47 Mo. 37; Sutton v. Hayden, 62 Mo. 101; Sharkey v. McDermott, 91 Mo. 647; Hall v. Harris, 145 Mo. 614; Alexander v. Alexander, 150 Mo. 579; Fuchs v. Fuchs, 48 Mo. App. 18.

LAMM, J.—This is a suit in equity to enforce specific performance of an alleged oral contract between Francis Moreau, deceased, on the one part and Rosalie Berg, deceased, on the other, to make a will devising or otherwise conveying a certain small parcel of real estate in St. Louis county, and bequeathing certain chattels to said Rosalie Berg, in consideration of services to be by her rendered and which, it is alleged, were fully performed.

The chancellor, having decreed specific performance, defendant appealed. After the cause came here, Rosalie Berg, plaintiff below, died testate, leaving her husband, John Berg, executor and sole devisee; whereupon on suggestion and by stipulation the cause was revived in the name of John Berg as respondent.

The learned chancellor made a finding of facts and pronounced thereon conclusions of law, as follows:

"The following facts are established beyond dispute.

"Francis Moreau was, in February, 1901, 79 years of age. He was somewhat feeble but led an active life and did not anticipate any immediate or sudden death. He lived practically alone. His only child was a son, living apart and somewhat estranged. The son was in independent circumstances, having a house and family of his own.

"Mr. Moreau owned a small homestead of 5.30 acres, worth $1,000 to $1,500, a detached farm of 85 acres of land, worth about $10,000, notes amounting to

about $2,000, and a horse and buggy, with some house-hold effects about his house, worth together $135.

"He needed the assistance of a woman, to live with him, keep house for him, minister to his wants and nurse him in sickness. He secured the services of Mrs. Berg, to stay with him with her husband, for this purpose. He was not to pay her or compensate her in money for her services. This is testified to by witnesses for plaintiff and for defendants. (Testimony of Wielandy, Constantine and Schrader, with that of others.) In lieu of wages he was to give her the homestead of 5.30 acres—for how long is disputed—with the horse and buggy and certain other personal property—which is also in dispute.

"Mrs. Berg, with her husband, moved to Mr. Moreau's house and faithfully performed the services required of her to his satisfaction from February 6, 1901, to his death, February 14, 1902. The reasonable value of her services for this period, so far as the same can be estimated in money, was $15 per month for eleven and one-half months, and $3.50 per day for the remaining 23 days, being in all $353.

"The use of the property for two years with the horse and buggy and all the furniture in the house, bequeathed to Mrs. Berg in the last will, were of the value of $335 to $375.

"*The disputed or uncertain matters* in the understanding or arrangement between Mr. Moreau and Mrs. Berg are two, viz.:

"(1)    What personal property besides the horse and buggy, if any, he promised or agreed to give her.

"(2)    Whether he agreed or promised to give her the homestead property absolutely or only for two years.

"1.    The uncertainty or indefiniteness as to the personal property appears in comparing the provisions of the first will with the oral testimony. In the will, which is followed by the petition, the testator under-

took to give to Mrs. Berg '*all my personal property.*' Mrs. Fitzwater (who wrote the will) in her testimony qualifies the words 'all the personal property' by the further words '*everything in the house*'—'the house and all there was in it, the house and all his personal property.' Mr. Sandoz testifies that Moreau stated he had given 'all his *house property* to Mrs. Berg and the place too.' Mr. Schrader testifies that he said 'he had promised her the horse and buggy and the *furniture in the house,* and the place,' etc.

"It is quite clear that in the connection in which the words 'personal property' were used, with the words 'horse and buggy' they were understood in the common sense, as meaning property of the same character, that is, specific goods and chattels, and not money or choses in action. They included the household property, goods and chattels and horse and buggy, which were afterwards inventoried and appraised at $135.

"2. There is no uncertainty as to the interest or estate in the homestead property intended, except in Mr. Moreau's declaration to Mr. Schrader, which is embodied in his last will also, that he had promised to give 'the place there *two years free of rent* after his death.'

"But it should be remembered that this was a declaration in his favor, not proper evidence in his own behalf (although not objected to), and should be given but little, if any, weight, as against previous declarations against his own interest. These previous declarations had been, that Mrs. Berg was to get 'the place' (Testimony of Oldworth); 'the place' would belong to her (Genail); he would give 'the place' to Mrs. Berg (Levick); she can have 'that little place, that 5 or 6 acres' (Wielandy); he was going to give her 'the property' where Mr. Moreau lived—5 acres and something, 'this property' (Constantine); 'the five acres and thirty one-hundredths'—'this place I will give Mrs. Berg'

(Mrs. Fitzwater); he would like to have a deed made, was going to give her the place—the home place, the place where he lived—five acres of land (Sandoz); 'this house and five acres and thirty one-hundredths of an acre,' giving the boundaries (in the first will, dated February 3, 1902).

"These declarations are too strong and clear to be cut down to an estate limited to two years by subsequent declarations in his own favor, under different influences, made when his days were numbered, and he could see that, as it was then likely to turn out, Mrs. Berg would have the better of the bargain.

"I.   One can not escape the conviction that Mr. Moreau did enter into a parol agreement about February 6, 1901, wherein he promised, in consideration of her removing to his house with her husband and there living with him, keeping house for him, and ministering to his wants and nursing him in sickness, during his lifetime, he would, at his death, convey to her by will or otherwise the homestead place of 5.30 acres with the household goods and chattels in the house and his horse and buggy on said premises.   The contract is clear, definite and unequivocal, in all its terms.   There is nothing uncertain, ambiguous, or unsatisfactory in the evidence.

"II. Such agreement, being by parol, could not be enforced if it had not been performed in whole or in part, so that it would be inequitable to refuse performance.   The performance by Mrs. Berg was complete and satisfactory.   The acts of performance point unmistakably to the agreement or promise as the inducement thereof, and can not be accounted for in any other manner.   Mrs. Berg was a stranger called into the house at the request of Mr. Moreau.   She was therefore not likely to work without compensation, or merely for a home and board for herself and husband. The evidence, as well as the character of the work, indicate that she was to be compensated.   The evidence

also shows that she was not to be compensated in money. It follows that her acts must be referred to the parol promise to compensate her in property, as the only reasonable manner of accounting for her services. They are such as would not have been rendered unless on account of that agreement and with a direct view to its performance.

"III. Specific performance should not be enforced if it would be unconscionable or inequitable, or would work a hardship or injustice. All that can be said against the enforcement of this contract, is that the property given to Mrs. Berg by Mr. Moreau in his last will is about what is reasonable compensation for what she did, and to give her more would be overpayment; to enforce the contract would give her nearly four times the amount of reasonable compensation. But at the time the contract was made, Mr. Moreau's reasonable expectation of life was from 4.38 to 4.74 years, and he might have lived much longer. If he had lived out his time, the compensation agreed upon would have been no more than fair. And if he had lived longer, it would have been inadequate. The contract was made with reference to the probability of life, and not with the expectation of an untimely death. It was not inequitable or unconscionable when it was made. Mr. Moreau was at the time in good mental condition, and there is no evidence of any undue or improper influence. We should also consider the nature of the services agreed upon, which were performed, and which might have been required under the contract. Their value can not well be estimated in money. The law furnishes no standard by which a money value can be placed upon them. Equity can only make an approximation in that direction by carrying out the agreement in which the parties fixed a value between themselves.

"Under all the circumstances of the case, the contract was an equitable and just one, and being fully

performed upon the one side, should be performed upon the other.

"If plaintiff will amend his petition as to the description of the personal property, according to the foregoing findings, the decree will be for plaintiff for specific performance, with costs."

The record presented to us sustains the finding of facts, we think, hence it is adopted as our own so far as it goes. It may be supplemented, however, in certain particulars. Thus: August Moreau, the only son and defendant, was about fifty-seven years old. He had lived in New Orleans and then in the neighborhood of his father, since '66, part of the time in the city of St. Louis and part of the time in the county of St. Louis, about two miles away from the homestead in question. Up to ten or twelve years before his death, Francis Moreau had a wife and children at home who had died one by one—the last one, a daughter, Christine. Because of unexplained reasons, August and his father were not friendly at times. At other times their relations were more cordial. But, the record does not sustain the theory there ever was a complete reconciliation. The father, when stripped of his family by death and with the hand of age and decrepitude resting heavily on him, declined to live in the son's family—where the shoe pinched on this score is not disclosed. The son's bearing toward his father caused him distress and this distress the old man exhibited to others, and he indicated a lack of testamentary disposition towards the son because of alleged unkind treatment. On being inquired of in this behalf on the stand whether his father had not expressed himself many times as intending to disinherit him because of unkind treatment, August answered: "That has nothing to do with family affairs. You fall out with your wife and I with mine, and we come together again as man to man." In response to another question, he said, "Father and I made up and took a glass of beer." It seems they vis-

ited each other very seldom, but it also seems that when the father was sick the son always visited him, or inquired about him, and for a few days, towards the end of his last sickness, the son was his constant attendant.

The homestead, the subject of controversy, was but a short distance from the valuable farm of eighty odd acres belonging to the father, referred to in the finding. It (the homestead) was planted in fruit and had on it a dilapitated old house, originally one room and a porch, but the porch had been inclosed for a kitchen; the dwelling was of trivial value and called a "shanty" in evidence. Connected with the house was a wine cellar, and one witness testified that "the best part of the house was the cellar." As found below, there was evidence that this homestead was of the value of from $1,000 to $1,500. There is also evidence that Francis Moreau valued it at from $800 to $900, and offered it at that sum prior to the Bergs' coming to live with him—at a time he contemplated quitting the country and going to France. To his estimate of the value must be added his subsequent improvements, of the worth of, say, $200, which (with a possible rise in value), agrees with the finding of the chancellor. After the daughter's death, the father continued to live there until he died in February, 1902.

As his name indicates, he was a Frenchman and seems to have been a man of sprightly traits, given to hospitality and of good neighborly disposition. As said in the finding of the chancellor, he was somewhat feeble and, it may be further said, that off and on he was sick—would be up and down, in the homely phrase of some witnesses, and needed and craved companionship and nursing. A young daughter of a nearby neighbor came over every day for a long period, somewhat as a companion and to do what she could of his simple housekeeping. The neighbors took an interest in him and

there is evidence indicating that he was at their mercy for any kindly offices when ill and lonely. At this time, there was a family some miles away, also French born,—the Bergs—consisting of a husband, John, and his wife, Rosalie. They were in humble walk in life— both doing neighborhood work for a livelihood—and living in a small tenement. At some time, not disclosed, Francis Moreau became acquainted with the Bergs, who seemed to be honest and estimable people, well-liked by him. At odd spells Rosalie Berg came to Moreau's to do house work for him, and he evidently liked her ways so well that early in 1901 the old man conceived a plan of bringing the Bergs over to his place to live with him. To this end he entered into an agreement with them, evidently of a permanent character of some sort. Accordingly, he enlarged the old house by building a small addition to accommodate Rosalie Berg and her husband. He told the neighbors, in effect, that he had made an arrangement with the Bergs to cast their lot with him and take care of him the balance of his days, and that he added to his house for that purpose and to suit Mrs. Berg, and that she was to have the homestead and certain personal property for her services to him. The character and scope of this agreement are set forth in the aforesaid finding of facts and need not be further detailed.

In February, 1901, John Berg and his wife moved to Moreau's and thereafter all of them lived as one family; and the evidence is all one way that Mrs. Berg was his faithful and kind attendant, day in and day out, from that time until death parted them. There is not a scintilla of evidence that she was remiss in any pious service of hand or foot or look or word or kindly disposition to minister unto him, whether at his beck and call or in the more delightful form of anticipating his wants and wishes.

During the year, a neighbor was applied to to write a will, but he preferred not to do so. Early in Febru-

ary, 1902, when his last sickness was on him, another neighbor, Mrs. Fitzwater, wrote a will at his dictation (which will he duly executed) as follows:

"February 3, 1902.

"I, Francis Moreau, of Creve Coeur, St. Louis Co., Mo., being of sound mind do hereby make and publish the following as and for my last will and testament (1) I will Mrs. John Berg this house and five acres and thirty hundredths of an acre provided she stays and takes care of me as long as I live I will her this house and everything in it my horse and buggy and all my personal property I will that one hundred dollars be spent for masses for my wife my son Alex my daughter Gustine and myself twenty five each and one hundred for my burial twenty for my name being enscribed on the monument in my lot the residue of my property I will to my son August Moreau. This house I will Mrs. John Berg is bordered on the north by Lackland ave on the south by Herman Cropert on the west by Lucy Woodson and on the east by Herman Cropert.

"I hereunto subscribe my hand and affix my seal this 3 day of February, A. D. 1902.

"FRANCIS MOREAU.    [Seal.]"

There is evidence that Mrs. Berg had been somewhat anxious that a will should be written, and her anxiety, we think, can naturally be referred to the original understanding she had with Mr. Moreau and to the precarious condition of his health. A few days later some acquaintances of Mr. Moreau, entirely friendly to the son's interest (and we think in his interest), took it upon themselves to visit the old man, then about to give up the ghost. The evidence bears the construction that they went there determined to see if he had made a will. We think, furthermore, that August was solicitous about the testamentary disposition of his father towards him and that the visit of these neighbors hinged upon that solicitude. Precisely what occurred at that

visit is neither fully nor satisfactorily uncovered, because there are discrepancies between the witnesses, but the upshot of it all was that these neighbors, or one of them, called for and got a lengthy private interview with him, and, as the result of their visit and the ostensible interest they took in his affairs, a new will was then and there written and executed on the 11th of February, 1902, as follows:

"Creve Coeur, February 11th, 1902.

"I, Francis Moreau, of Creve Coeur, St. Louis Co., Missouri, being of and disposing mind and memory, but aware of uncertainty of life, do hereby make, publish and declare this my last will and testament, hereby revoking any and all wills by me before made.

"It is my will that my just debts, together with my funeral expenses, be paid out of my estate, also $25.00 (Twenty-five dollars) for masses for my soul.

"All the rest, residue and remainder of my estate, real and personal, which I may own or be entitled to by in law or equity at the time of my death, I give, devise, and bequite unto my son, August, given him the right to sell and re-invest as he may desire.

"To Rosalie Berg I bequite my horse and buggy and all the furniture in the house, and the lease of the place for 2 two years after my death, free of charge.

"I herewith nominate and appoint my son, August Moreau, as the executrix of last will and request that he not be required to furnish bond as executrix.

"Witness my hand and seal this 11th day of February, 1902.                    FRANCIS MOREAU."

It could not be found, and was not found below, that Francis Moreau was of unsound mind when he executed this last will. But it should be said, as a circumstance in the case, that the shadows of death were deepening about him when it was executed. We think, furthermore, it is fairly inferable from the testimony of appellant's witnesses, that he was greatly agitated

as a result of the interview and we much doubt if the will would ever have seen the light of day had it not been for that visit and that interview.

It will be seen at a glance that the son was benefited materially by this last testament; for not only was the fee simple devise to Mrs. Berg cut down to a term of two years, but, singularly enough, the son was further benefited by omitting from the last will the provision of the first to the effect that $75 be spent for the pious purpose of masses for testator's dead wife, his dead son and his dead daughter. That so peculiar a change should be made in the will of a man on his deathbed can be most naturally explained as the result of the guided and interested (not to say mercenary) hand of a person or persons having dollars, rather than religious sentiment, in mind, and it was not likely to have been a thought originating with the devout Catholic then *in extremis*.

Three days later, February 14, 1902, Francis Moreau died. His last will was duly probated and August Moreau took upon himself the burden of administering upon the estate in accordance with that will. The first will was introduced in evidence as somewhat corroborative of the original testamentary contract set forth by plaintiff in her petition and found to exist.

Defendant pleaded in his answer, and here relies upon the Statute of Frauds. He contends, furthermore, that the contract was not established by clear, definite and unequivocal proof—proof leaving no room for reasonable doubt in the chancellor's mind. That the terms of the contract proved were uncertain and ambiguous. That the statements and admissions of decedent in proof were mere loose declarations insufficient to establish the contract. That the acts claimed to be in performance of the alleged contract (and relied upon by respondent as filling that office) were not such as would not have been done unless on account of that very agreement and with a direct view to its perfor-

mance. And respondent contends, further, that the enforcement of specific performance is not a matter of absolute right, but rests in the sound discretion of the chancellor, to be governed by circumstances, and will not be granted if unjust, unconscionable or inequitable, as, respondent says, the contract in this case was.

In view of these contentions, was the decree right? And should the conclusions of law pronounced by the court below be adopted by us on a re-examination of the whole record?

I. Our statutes denouncing as void a certain class of contracts unless evidenced by writing, Revised Statutes 1899, chapter 31, borrowed from 29 Car. II, c. 3, are a monument to the deep wisdom of ages gone, and in their purpose and scope are leveled at preventing the commission of frauds and perjuries by drying up at least some of the springs from which they flow—closing the door through which they enter. [Russell v. Sharp, 192 Mo. l. c. 284-5.]

The old common-law lawyers saw with reluctance equity step in and administer this plain, written law in accordance with equitable rules—the controlling one of which is said by Black (Black's Law Dict., tit. Equity) to be "the rule of doing to all others as we desire them to do to us; or, as it is expressed by Justinian, 'to live honestly, to harm nobody, to render to every man his due.' [Inst. 1, 1, 3.]"

If we may be permitted a modest speculative flight, it may be said that (if it were not for the fact that the statute relating to frauds and perjuries was enacted during the reign of the grandson of James I and, hence was not in existence during the reign of the latter king), doubtless, in the memorable controversy before James in the great case of Law v. Equity wherein the sour and learned Coke argued for the Law and his renowned rival, Bacon, argued for Equity, with discourse flying high they would have broken a lance with each other in the lists of reason on the right of equity to

suspend or modify the operation of the Statute of Frauds under any circumstances whatever. Be that one way or the other, certain it is that under given conditions the naked wording of the statute may be gently wrested somewhat by equitable interpretation and exposition in order to advance the underlying reason of the thing and this was early settled and has long been held by the courts of England and America. [4 Pom., Eq. Juris, (3 Ed.), sec. 1409.]

Nevertheless, equity did not come to destroy the law, but to fulfill the law. The very heart of the statutory purpose to be subserved, the remedy to be advanced, being to prevent the commission of frauds and perjuries, that purpose is subserved in equity by not allowing the statute as a defense when to allow such defense would be itself to commit a fraud against the promisee who has performed the contract. Says VALLIANT, J., in Russell v. Sharp, *supra,* p. 285: "But when a court of equity exercises this authority it by no means brushes aside the Statute of Frauds or impugns its wisdom; on the contrary, it is so careful to see that the fraud which the statute was designed to guard against is not perpetrated that it really adds to the statute a new strength by demonstrating that it may be so administered that justice will not suffer or the statute be made the instrument of the very evil it was designed to prevent. And how does a court of equity accomplish this? By the simple common-sense rule of requiring one who invokes the aid of equity in such case to prove his case, not by vague or shadowy evidence, not even by a mere preponderance of evidence, but by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth; that no such doubt can linger either as to the existence of the contract or the certainty of its terms or that the plaintiff has wholly performed his part."

To the same effect is a long and unbroken line of

199 Sup.—28

pronouncements by this court, one more sample of which must suffice. Says Brace, J., in Kinney v. Murray, 170 Mo. l. c. 700: "A court of equity in this State will specifically enforce an oral contract to make a will in a particular manner, where a valuable consideration has been received for the promise and a fraud would be perpetrated upon the promisee or beneficiary unless the contract be performed. But, the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. 'There must be no equivocation or uncertainty in the case.' "

The ground upon which the equitable remedy stands is stated by the Supreme Court of Maine as follows (Woodbury v. Gardner, 77 Me. *infra* p. 70): "The ground of the remedy is an equitable estoppel based on an equitable fraud. After having induced or knowingly permitted another to perform in part an agreement, on the faith of its full performance by both parties and for which he could not well be compensated except by specific performance, the other shall not insist that the agreement is void. . . . . In other words, the Statute of Frauds having been enacted for the purpose of preventing frauds should not be used fraudulently."

II. The principles upon which the right to specific performance of an oral contract to make a will devising real estate in return for promises to be kept and covenants to be performed by the beneficiary being well established, to be not only that some contract existed, but that the specific contract sought to be enforced existed; not only that some contract was performed by the beneficiary, but that the identical contract sued

on was performed and that the acts relied on to show performance should point unvaryingly as the needle to the pole to the contract in suit and to no other; and that the contract is not biting or against conscience, and those principles being further well-settled as requiring a high and stringent character of proof, to-wit, proof so impelling, so definite and clear that there can be no reasonable doubt of the existence of a contract, of its terms and of its performance; and not only so, but that there is no adequate remedy at law in money recompense, *i. e.*, that substantial justice, under the circumstances in judgment, requires the performance of the contract in kind and that it would be a fraud on the promisee not to perform—we say all these things being true and therefore taken as assumed, the question here is whether this case is controlled by said principles? The chancellor below in his conclusions of law and decree said it was—and we think he was right.

We content ourselves with adopting the finding of the chancellor without going into the many details of the evidence. It is sufficient for our purpose to say that the oral testimony did not relate to a contract sought to be established by loose, ancient conversations, such as exclaimed against by the courts, but to a contract established by fresh conversations, admissions and formal statements made at a time and under circumstances likely to command the attention of listeners. The testimony did not leave the case to conjecture—was not ambiguous, was heavily for the plaintiff's theory; shows a contract existed between Francis Moreau and Rosalie Berg; shows that Francis Moreau had that contract in mind when he executed his first will and that said will was made in performance of the agreement, at least was corroborative of it; shows the terms of the contract were as found by the chancellor; shows rounded-out performance on the part of Rosalie Berg; and further shows, in our opinion, that it was a reason-

able contract—*i. e.,* one not unjust, inequitable, singular in its terms or unsuited to the condition of the parties or the circumstances surrounding appellant's ancestor.

III. In this condition of things, the way we look at it is that the father of appellant impressed upon his estate the obligation and burden of procuring for his last days the ministrations which his age and feebleness craved, but which were somewhat denied him as a tribute of affection from blood kin, and we are of the opinion that the son should take the estate *cum onere,* that is, diminished by the full performance of that contract.

And this is so because the services of Rosalie Berg are not susceptible of being nicely measured by a mere money yardstick. Appellant's learned counsel make a close and ingenious calculation in dollars and cents and they fortify that calculation by evidence showing that Mrs. Berg would have been well paid (as the custom of the country ran in prices) by awarding her a money judgment of, say, two or three hundred dollars, or by forcing her to accept the terms of the last will— and they ask us to drive a keen bargain and adjust the controversy by adopting that notion. One trouble with this view is that it is directed to a court of conscience —a court in which the jingle of the guineas of a mere dry money recompense cannot cure the hurts of a broken contract relating to services such as were performed in this case. Another trouble with this view is that appellant's ancestor and Rosalie Berg did not make that kind of a contract. The vice of the contention is pointed out by SHERWOOD, J., in Sutton v. Hayden, 62 Mo. l. c. 114, thus: "There are things which money cannot buy; a thousand nameless and delicate services and attentions, incapable of being the subject of explicit contract, which money, with all its peculiar potency, is powerless to purchase. The law furnishes no standard whereby the value of such services can be estimated, and equity can only make an approximation in that

direction by decreeing the specific execution of the contract.'' [See, also, remarks of VALLIANT, J., *arguendo*, in Lynn v. Hockaday, 162 Mo. 1. c. 126.]

As put by VIRGIN, J., in Woodbury v. Gardner, 77 Me. 1. c. 59, *supra*: ''When a party to an agreement, fair and just in its terms, understandingly entered into and concluded, is injured, without default on his own part, by the non-fulfillment of the other party, the most direct and satisfactory remedy which he instinctively seeks is specific performance. This practical result he cannot obtain by the common law, for that measures all losses by money; but equity comes in to supply this more complete justice, and has laid down certain rules of relief by which, when its circumstances bring it within them, every contract susceptible of substantial enjoyment may be enforced.''

IV. Appellant's learned counsel argue as follows: ''The plaintiff and her husband were evidently poor, living in a small rented house, he working around as a laborer, and she doing such woman's work as she could get in the neighborhood, evidently of a menial character. It was a godsend to them to have a new room free of rent, with free board. He could and did continue to work around the neighborhood, and she by the move had steady employment, working right at home without having to go out to seek for it. What hardship or sacrifice on her part was occasioned by the move, or what injustice could be done her not to enforce the contract, would require a vivid imagination to conceive.''

But will it do for us to say that the Bergs were poor and ate their daily bread in the sweat of their brows—lived humbly and dined scantily from hand to mouth out of a precarious daily wage at a rented fireside and hence, in some bitter way, these facts should control the equities of this case? The animated language of the learned jurist, just quoted from the Sutton case, takes no note of poverty or humbleness. It proceeds on the lofty plane that a contract made with a

lowly one is as sacred and as binding and as readily to
be enforced as a contract made with one seated in a
high place.  It proceeds on the theory that services ren-
dered by the poor and obscure are as full and rich in
sentiment and as deserving of every remedy allowed
by the courts as services rendered by the rich or the
happily-circumstanced.

For aught we know this lonely old Frenchman
longed for the accents of his mother-tongue, and the
pleasant memories of his youth awakened thereby soft-
ened the distress of fourscore years.   Certain it is that
*he* took no note of the fact that the Bergs were poor and
obscure, and why should *we?*  It would seem to be the
crowning glory of the law that its benediction falls, like
the rain and the dew of Heaven, on all alike.

The judgment is affirmed.

All concur.