## SALLY L. WALES, Appellant, v. IDA C. HOLDEN et al.

### Division One, February 26, 1908.

1. **ADOPTION OF CHILD: Proof.** Proof of a contract in a suit in equity to enforce a specific performance of what is alleged to have been an oral contract to adopt plaintiff as a child of decedent and to make her an equal heir with his own child, must, in the face of the Statute of Frauds, be overwhelming in its probative force, leaving no room for a reasonable doubt as to the existence of the contract. And the proof in this case does not measure up to that standard.

2. ————: **Character of Parties.** In a suit to establish a contract of adoption of a child, the characters of the persons whose actions and transactions are under review are important facts to be considered, in passing upon the credibility and accuracy of the evidence.

3. ————: **Habits of Adopting Parent: Competency.** Where plaintiff's evidence rests only on the alleged contract of adoption, the character, habits and business methods of the deceased adopting parent are not competent evidence; but where plaintiff, in order to avoid the bar of the Statute of Frauds, undertakes to make a showing of specific performance, such evidence is competent.

4. ————: **Unreliable Evidence.** Evidence that rests alone in the memory of witnesses attempting to recall conversations which occurred thirty years ago, when they were fourteen or fifteen years old, is not reliable, especially where resort must be made to those conversations for ascertaining what the contract was. And when their testimony is irreconcilable on every circumstance connected with the child's going to decedent's home, except the one point that all say he agreed to adopt her, it will not be held sufficient to establish the existence of a contract on his part to adopt her and make her his heir.

5. ————: **Part Performance: Consistency.** When a court of equity is asked to enforce an oral contract, void under the Statute of Frauds, on the ground of part performance, it requires that the part performance relied on should be of a character not only consistent with the reasonable presumption that what was done was done on the faith of such contract, but also that it would be unreasonable to presume that it was done on any other theory; and it cannot be held that the fact that an orphan girl eight years old, in indigent circumstances, was taken into

a family of comparatively wealthy people and reared and educated on an equality with their only daughter, was consistent only with the theory that she was an adopted daughter and that at the death of the father his only child was to make an equal division with her of an estate which was the product of his whole life's work.

Appeal from Nodaway Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

AFFIRMED.

*Hudson & DuBois, Ab. H. Romans* and *Ernest Engle* for appellant.

(1)   Oral contracts of the kind stated in the petition, when proven according to the standard of proof required, and shown to be performed, will be decreed to be specifically enforced.   Lynn v. Hockaday, 162 Mo. 111; Berg v. Moreau, 199 Mo. 416; Sharkey v. McDermott, 91 Mo. 647; Russell v. Sharp, 192 Mo. 270; Kirk v. Middlebrook, 201 Mo. 245; Rosenwald v. Middlebrook, 188 Mo. 58; Grantham v. Gossett, 182 Mo. 651; Alexander v. Alexander, 150 Mo. 579; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; Nowack v. Berger, 135 Mo. 24; Teats v. Flanders, 118 Mo. 660; Healy v. Simpson, 113 Mo. 340; Davis v. Hendricks, 99 Mo. 478; Hale v. Haris, 145 Mo. 214; Wright v. Tinsley, 30 Mo. 389; Clark v. Cordry, 69 Mo. App. .6; Stone v. Pennock, 31 Mo. App. 544; Lee v. Howe, 27 Mo. 521; Farrow v. Patton, 20 Mo. 81.   (2) Plaintiff's objection to the competency of Ida C. Holden, as a witness, should have been sustained, for the reason that she was a party to the suit, interested in the result, and is making a defense, and claiming her interest in the estate of George W. Lewis, deceased, under him, who, if living, would have been incompetent as a witness on the ground that Asa Kelim, the other party to the alleged contract of adoption, was dead. Sec. 4652, R. S. 1899; Messimer v. McCray, 113 Mo.

387; Warfield v. Hume, 91 Mo. App. 546; Meier v. Thieman, 90 Mo. 433; Tucker v. Gentry, 93 Mo. App. 662. (3) Plaintiff is not presenting and making a claim against the estate of George W. Lewis, deceased, but is asking for a distributive share of the estate, and was a competent witness in her own behalf. And, in any event, she was a competent witness to deny and give her version of statements and conversations, testified to by the defendant, Ida C. Holden, claimed by her to have been had with, or in the presence of, plaintiff. Spradling v. Conway, 51 Mo. 54; Hoit v. Davis, 30 Mo. App. 314; Brandon v. Dawson, 51 Mo. App. 244; Lynn v. Hockaday, 162 Mo. 124; 30 Am. and Eng. Ency. Law (2 Ed.), 1031; Wade v. Hardy, 75 Mo. 401; Vandergrif v. Swinney, 158 Mo. 527.

*J. W. Peery* for respondents.

(1) Mrs. Holden was a competent witness in her own behalf. She was not a party to the contract sued upon. She did not derive her right of defense from her father in the statutory sense. She was defending her title to this property in her own right. Reed v. Painter, 145 Mo. 341. She did not testify to any conversation or transaction with Asa Kelim nor to any act or fact with which he was connected, or of which he, if living, would have had any knowledge. Weiermuller v. Scullin, 203 Mo. 472. (2) Plaintiff was not a competent witness to testify to the facts recited in her offer because the administrator of George W. Lewis was a party of record to the action, and under the law was a necessary party. She was therefore excluded by the terms of the statute. Weiermuller v. Scullin, 203 Mo. 474. (3) Under the allegations of the petition, it was made an issue in the case whether Judge Lewis had always recognized the contract pleaded, and always intended to carry it out; and whether during all the time intervening between the making of it, and his

death, he and the plaintiff performed it and recognized it. Upon the issue so tendered the acts and declarations of the deceased were competent. The *res gestae* of this transaction was not confined to the very moment of the making of the alleged contract, but it embraced all of the time of its alleged performance. Maxwell v. Ratliff's Admr., 26 Ind. 157; Overseers v. Overseers, 2 Klup (Pa.) 441; Jewell's Lessee v. Jewell, 42 U. S. 219; Northup v. Hale, 76 Me. 306; Swink v. French, 11 Lea 78; Washington v. Bank, 171 N. Y. 163; Baker v. Kelly, 41 Miss. 696. In the construction of an ambiguous contract, the court will look not merely to the words employed, but to the subject-matter, the surrounding circumstances and the contemporaneous interpretation thereof by the parties themselves. Williams v. Railroad, 153 Mo. 487; Carter v. Foster, 145 Mo. 383; Witmore v. Crouch, 150 Mo. 671; St. Louis v. Gas Co., 155 Mo. 1. All of the evidence admitted and excluded is preserved and set out *in extenso* in this record. In such case the rule in appeals in equity, established by a long line of decisions, is that this court will reject evidence improperly admitted or consider evidence improperly excluded, and try the case *de novo*. State ex rel. v. Jarrott, 183 Mo. 218; Carpenter v. Roth, 192 Mo. 658; Bouton v. Phippin, 192 Mo. 473; Ross v. Ross, 83 Mo. App. 330; McCormick v. Parsons, 195 Mo. 91; Goodrick v. Harrison, 130 Mo. 269. (4) The evidence for plaintiff was wholly insufficient to justify a decree in her favor in this character of action. There was no sufficient and satisfactory proof of the contract alleged. There was no clear or cogent proof of the performance of that particular contract. Fanning v. Doan, 139 Mo. 392; Steele v. Steele, 161 Mo. 566; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; McKee v. Higbee, 180 Mo. 263; Asbury v. Hicklin, 181 Mo. 658; Grantham v. Gossett, 182 Mo. 651; Rosenwald v. Middlebrook, 188 Mo. 58;

Brevator v. Creech, 186 Mo. 558; Russell v. Sharp, 192 Mo. 270; Berg v. Moreau, 199 Mo. 416; Kirk v. Middlebrook, 201 Mo. 245; Albring v. Ward, 137 Mich. 352.

VALLIANT, P. J.—This is a suit in equity to enforce specific performance of what is alleged to have been an oral contract to adopt the plaintiff, then a child eight years old. The contract is said to. have been made in April, 1874, when the plaintiff was an orphan living in the home of her paternal uncle, Asa Kelim, and the parties to the contract were Asa Kelim acting in *loco parentis* for the plaintiff and George W. Lewis in his own behalf. The latter was known as Judge Lewis, formerly a judge of the probate court and afterwards and for many years one of the prominent lawyers in that part of the State. Judge Lewis died November 22, 1902; Asa Kelim died several years before, therefore when this suit was begun both the contracting parties were dead.

The petition states that on her death-bed the plaintiff's mother placed her in the care of this uncle "requesting him to procure a home for her with some good family in such manner and place as his best judgment might dictate where she might be educated and well raised." That on the death of plaintiff's mother her uncle took her to his home, applied for and obtained letters of guardianship and she was living with her uncle when, in 1874, Judge Lewis and his wife came to Grant City, near which her uncle lived, and asked him to allow them to take plaintiff and adopt her as their own child, to which her uncle consented and thereupon it was agreed "by and between the said Asa Kelim as guardian of the person of the plaintiff and by virtue of the power and authority delegated to him by plaintiff's mother, and the said George.W. Lewis, that he, the said George W. Lewis, would take the

plaintiff herein, adopt her and make her his adopted child, educate, care for and give her all the rights of a natural child, and at his (the said George W. Lewis's) death this plaintiff should be entitled to and receive an equal share with his other child or children, of all of his (the said George W. Lewis's) estate and property, real, personal and mixed, wherever situated.''

Then the petition goes on to state that in conformity to that agreement plaintiff was taken into the Lewis home and remained there nine years, until 1883, when she was married and went to a home of her own with her husband; that during all that time she was treated as a daughter in the family and conducted herself as was becoming to one in that relation. That while she lived in his family Judge Lewis frequently told her of his ''agreement of adoption;'' that by its terms she ''had been legally and lawfully adopted and was to have and receive an equal share as such adopted child with his other child or children in all the property that he might have at his death, wherever situated, and whether real, personal or mixed.'' That for several years before her marriage Judge Lewis and his wife were old and feeble and she alone ministered as a daughter to them. The petition states and reiterates that Judge Lewis always recognized the contract of adoption ''and always intended to carry out said contract and agreement of adoption and always intended that plaintiff should, at his death, share equally with his other child or children in all his estate.'' And yet the alleged adopting father died in 1902, leaving an estate worth about $200,000 and only one heir, his daughter, Ida C. Holden, who and her husband, who is also administrator of the estate, are the defendants in this suit. The trial resulted in a judgment for defendants and from that judgment the plaintiff prosecutes this appeal.

There was evidence tending to support the plaintiff's claim, the character of which evidence we will consider later. Both parties to the contract being dead and there being no deed or other evidence in writing, necessarily the evidence for the defendants was in a great degree negative in form. The circumstances of this case forcibly illustrate the wisdom of the rule of evidence so firmly established and so often declared by this court, namely, that the proof to sustain a claim of this kind, in the face of the Statute of Frauds, must be overwhelming in its probative force, leaving no room for a reasonable doubt. We do not consider it necessary to discuss that rule at this time; we can add nothing in the way of argument to what we have already in many cases said. [Steele v. Steele, 161 Mo. 566; Kinney v. Murray, 170 Mo. 674; McElvain v. McElvain, 171 Mo. 244; McKee v. Higbee, 180 Mo. 263; Asbury v. Hicklin, 181 Mo. 658; Grantham v. Gossett, 182 Mo. 651; Rosenwald v. Middlebrook, 188 Mo. 58; Berg v. Moreau, 199 Mo. 416.]

The cases relied on by appellant do not in the least impair the force of those decisions. Sharkey v. McDermott, 91 Mo. 647, came up on a judgment sustaining a demurrer to the petition in which the oral contract and the full performance on the part of the child were clearly stated. The trial court had sustained the demurrer and the Court of Appeals affirmed the judgment, but this court held that the petition stated a cause for relief in equity and remanded the cause for trial. There was no question of the sufficiency of the evidence in that case.

In Lynn v. Hockaday, 162 Mo. 111, the evidence was clear and convincing, and besides, the undisputed facts in that case are in striking contrast to those in this case. In that case the child was only three or four years old; her name was changed to that of her adopting parents; at home, at school, in society, wher-

ever she went she was known as Lillie Lynn, as the
daughter of Mr. and Mrs. Lynn, and as their only
daughter; she did not herself know until she was seven-
teen or eighteen years old that Mr. and Mrs. Lynn were
not her own father and mother; she was married in the
home of her adopting parents in their presence and
under the name of Lillie Lynn. Besides, the adopting
father in that case, though he was an intelligent and
well-to-do-farmer and perhaps knew that there should
be some written document to evidence the adoption,
yet if he knew it he doubtless did not appreciate its
importance as he would have done if he had been, as in
this case, a learned and exceedingly careful lawyer.

Before taking up the evidence for the plaintiff
tending to prove the oral contract, let us see what the
undisputed facts were to which that evidence was aimed
to apply.

The plaintiff's father died in 1866, she was born
soon after. Her mother with three children, two boys
(the eldest born in 1860) and this girl, came to Mis-
souri in 1867, to Worth county, where we infer she had
formerly lived and where Asa Kelim, a brother of her
former husband, lived. She married again after she
came to Missouri and had two children by her second
husband. When she was in her last illness she was in
quite destitute circumstances and she was greatly dis-
tressed at the thought of leaving her children, particu-
larly the three girls, with no one to care for them. Asa
Kelim visited her in her distress and being requested
by her to take the children and care for them until
he could get good homes for the three girls he promised
to do so and on her death he took them to his home. He
had a farm near the town, Grant City, consisting of
160 acres, on which he had a log house containing two
or three rooms. He had at that time himself five chil-
dren, but he was evidently a man whose heart was big-
ger than his fortune; he took these five children of the

plaintiff's mother, two of whom were not of his blood, and brought them under his roof to care for them. We infer that the father of the two youngest girls was living, but however that may be, good homes were soon obtained for those two.

Judge Lewis and his wife knew the plaintiff's mother and they both liked her; they also knew the plaintiff, then a little girl, and they were pleased with her. Just when they heard that it was the desire of Asa Kelim to find a good home for this child the evidence is not definite, but it seems they had heard of it, and in April, 1874, came to Grant City and after a conference with Asa Kelim took the child and carried her to their home, where she lived until she was married in 1883. During the years she lived in this family she was treated with kindness, she was clothed, educated and cared for as if she had been a daughter, and on her part she bore herself as a dutiful child. Her name was never changed, until her marriage; she was always known as Sally Kelim and under that name she was married. She was married at the home of Judge Lewis, but neither he nor Mrs. Lewis was present at the ceremony, it having occurred at seven o'clock in the morning before they had arisen. There was no deed of adoption ever executed. After their marriage the plaintiff and her husband took a short bridal trip and returned to Albany, where they lived about a year, then moved to another State and have not since lived in Missouri. On their return from their bridal trip, Judge Lewis gave the plaintiff $100. During the year they lived in Albany, Judge Lewis was on friendly terms with the plaintiff, he visited her several times. After she moved to another State he never visited her, although at intervals letters passed between them; occasionally some presents were sent from the Lewis family to the plaintiff's children. After the plaintiff moved to another State she came back on visits with her chil-

dren to Albany two or three times, and stayed at Judge Lewis's home; the last visit was in 1896 or 1897. There was no evidence that plaintiff was ever heard to say in the presence of Judge Lewis or any member of his family that she was an adopted daughter or an heiress of his estate. Judge Lewis died in November, 1902; the first claim the plaintiff ever made for any part of his estate was August 10, 1903, and it was made through her attorney.

In a case of this kind, when the evidence is shadowy, the characters of the persons whose actions and transactions are under review are important facts to be considered. When the credibility or accuracy of the evidence is fairly in question what might be believed of one person is often discarded as incredible of another whose character we know. Knowledge of character good or bad is an aid in such case. The character of Judge Lewis stands out very clearly in the evidence in this case. He lived in Albany, Gentry county, from 1846 to the time of his death, 1902; for twelve years he had been probate judge of that county; after that he practiced law and was one of the prominent lawyers in that part of the State. He was well known, every one seems to have known him. Those who knew him best considered him unusually methodical in the conduct of his business. Judge Goodman, at one time his law partner, and later judge of the circuit and now a prominent lawyer in that county, testified: "He was very careful, very accurate, very methodical and a man much set in his own way." All the witnesses who testified concerning his character and business methods agreed that he was methodical to an unusual degree, strict in all his business transactions, exacting all that was due him and with the same exactness giving to others all that was due them, and they all agree that he was honest and just. The evidence also shows that

Judge Lewis was not a companionable man; the plaintiff's counsel think that Dr. Campbell, a witness for defendants, portrays truly the character of Judge Lewis when he says: "Judge Lewis was a man who herded by himself." The testimony of Judge Goodman gives the same impression. At the date of the alleged contract Judge Lewis's family consisted of himself, his wife and one child, a daughter of seventeen years; the only evidence on the subject in the case shows that only the most affectionate paternal and filial regard existed between them.

All this evidence as to the character, habits and business methods of Judge Lewis went in over the objection of plaintiff and it is now insisted that it was error to have admitted it. If the plaintiff's case rested only on the testimony as to the alleged agreement or contract made between Asa Kelim and Judge Lewis on that day in April, 1874, when Judge Lewis and his wife received the child in Grant City and carried her home with them, the plaintiff's objection to this evidence would have more reason to rest on, but even then when we come to consider, as we will presently consider, the peculiar character of that evidence, the business habits and character of the man to whose conduct that evidence relates are just subjects for consideration. If the plaintiff had stated in her petition only that Judge Lewis had, on a certain day in April, 1874, entered into an oral contract with her uncle, acting in her behalf, to adopt her, but that in disregard of the contract he had failed to execute a deed of adoption, hence her prayer for specific performance, her petition would have been demurrable, it would have stated no cause of action at law or cause entitling her to equitable relief, the Statute of Frauds would have been a bar. And if after stating her cause as she has done in her petition, she had introduced evidence only as to what was said and done on that day in April a demurrer to her evidence would

have been fatal to her cause; in order to get over the bar of the Statute of Frauds she had to make a showing of performance on her part. In making that showing she necessarily brought out the home life of the Lewis family and, into conspicuous view, the life and character of the man. There was no error in receiving that evidence.

We turn now to the evidence of the plaintiff tending to prove the alleged oral agreement to adopt the plaintiff.

A witness who kept a hotel at Grant City testified that in the spring of 1874 Judge Lewis and his wife came to the hotel and told him that they wanted Sally Kelim, he told them where she was, down at Asa's; "they said they wanted to get her, wanted to adopt her; and I told somebody, I don't know who it was, that Judge Lewis wanted Sally Kelim and where she was, and somebody went after her, and they came back to the hotel and were there pretty near all day, if I recollect right, and they were handling some papers in the sitting room, I didn't go in there but I saw them in there as I passed in and out."

"Q. Well what did you hear Judge Lewis say, anything more than you have said? A. Well, Judge Lewis told me he wanted to adopt her, that is all."

It turned out in the evidence of the next witness, Lee Kelim, a brother of the plaintiff, that it was he to whom the hotel-keeper gave the message to Asa Kelim to bring the little girl to the hotel; this witness testified that he just happened to be passing the hotel when the keeper came out "and asked me where Sally was and I said she was down at Uncle Asa's, and he said, 'Judge Lewis is here and wants to get her and adopt her.' He says, 'Come in and see him.' He taken me into the barroom, and the Judge told me he had come up to get Sally and to adopt her and if Uncle Asa would let him have her to bring her up in the afternoon so him and his

wife could see her.'' The witness carried the message
and in the afternoon the uncle, Asa Kelim, the witness,
and a younger brother who has since died, and Sally,
came to the hotel and the conference was held. Sally
did not go into the room at first; the landlord's daugh-
ter met her and carried her off to another room to ar-
range her hair and toilet. When the uncle and the two
boys came into the room where Judge and Mrs. Lewis
were the Judge asked where Sally was; he was told that
she would be in in a few minutes, then he said: ''We
have come up to get Sally and we will take her into our
family. We will raise and educate her and have her as
one of our family.'' ''But he said he would not take
her unless he could adopt her. I put in a protest then.
In fact, I asked for him to take her on six months' trial,
and Mr. and Mrs. Lewis both spoke right up and said
they would not take her that way at all; that they did
not want to keep her six months and get attached to
her and then have to give her up. Uncle Asa studied a
little bit then, and said, 'Judge, I will let you have her
if you will take her and adopt her and educate her.'
And Judge Lewis said, 'I will do that.' '' Then Bob
(the younger brother) began to cry and said he did not
want her name changed and Judge Lewis said that
would make no difference at all. Then Asa Kelim
produced his letters of guardianship and they were
examined by Judge Lewis. After the agreement was
made they parted with the understanding that Judge
Lewis and his wife would call at Kelim's farm the next
morning to get Sally and take her to their home. Ac-
cordingly, Judge Lewis and his wife called and after
conventional morning greetings Judge Lewis said to
Mr. Kelim that he had come for Sally. ''Uncle Asa
says, 'Now, Judge, you will do with her just as you
have agreed to do, will you?' Judge Lewis says, 'Yes.
Are you ready to sign the adoption papers?' Uncle
Asa says, 'Yes, I am ready to sign them up to you, but

I would not let anybody else have her.'  He says: 'It grieves me awfully to sign away all my right to her, but I will do it for you.'  Then Sally was brought out and they all told her  good bye and she was put in the buggy; then Judge Lewis said to Mr. Kelim, 'You will be up town this afternoon will you?'  To which he answered, 'Yes,' and they drove away."  On cross-examination his attention was called to what he said in reference to the signing of the adoption papers by Asa Kelim.

"Q.  You say, the next morning, or the next day, when they came to the house, Judge Lewis asked Asa Kelim if he was ready to sign up those adoption papers?  A.  Yes, sir. . . .  Q.  Your idea was that if formal papers were executed Asa Kelim would have to sign the papers?  A.  Certainly he would, yes, sir."  This witness was a few months less than 14 years old at the date of the events he was attempting to recall, and between that date and the date on which he was giving his testimony thirty years had passed.

Another witness for plaintiff who had married a daughter of Asa Kelim testified that he was at the home of Kelim when the Lewises called and took the little girl away.  This witness undertook to repeat the conversation between Judge Lewis and Mr. Kelim on that occasion.  He testified that when Judge Lewis said that he had come for the child, Mr. Kelim said, "When it comes to signing my own flesh and blood away, I feel very bad about it, but, Judge Lewis, if you will take this girl and do as you have agreed to do with her—adopt her as a child—I will agree for you to take her."  Judge Lewis said, "I will take this girl and adopt her and raise her, and she shall be well cared for and have a good education and shall be as my own child, I will treat her as my child."  On cross-examination the witness's attention was called to a statement in his deposition taken before the trial in which he said that he was

not undertaking to give the language of Judge Lewis, but the impression that it made on him at the time, and he answered, "That is right; that is what I am stating to-day." Again in the deposition he was asked if he pretended to give the exact language used, he answered, "No, sir. That is my recollection in expressing their thoughts. Every man don't always use the same language to express the same thoughts." He had stated in his deposition that Asa Kelim told the little girl good bye when she was going to get in the buggy and he told Judge Lewis good bye also, but in his testimony on the trial he said he was not positive, but thought Mr. Kelim kissed the child good bye at that time. In the deposition the witness also stated that when Judge Lewis came to Mr. Kelim's that morning he said: "Mr. Kelim, are you willing to sign the papers that we spoke of, giving me the care and control of this child?" The substance of Mr. Kelim's answer was that though it grieved him much to sign away his own flesh and blood, yet knowing Judge Lewis so well he would do it.

The next witness, familiarly called by the attorneys "Tom or Uncle Tom," though of no kin to any one connected with the suit, testified that he heard Judge Lewis make a statement on the day he came to Grant City to get Sally. The talk occurred out on the street opposite the hotel, there were five or six people standing there and all were talking it over, and Judge Lewis said: "Yes, Sally is going home with me and I am going to have her adopted or going to adopt her." On cross-examination he was asked if he undertook at this date to repeat the exact words he heard on the street thirty years ago and he answered no. Then the witness was asked: "Did he use the word 'adopt' at all, Tom? A. It was something that way." On re-examination he was asked if he was not positive as to the words he did remember; to this the witness gave

a rambling prelude and then said: "He says, 'Yes, we are going to take Sally.' He spoke then that he was going to have her adopted, or something about that amount. That is about as near as I can recollect. It has been a long time ago, boys." The whole of this witness's testimony shows that it was of no probative value.

The next witness, a daughter of Asa Kelim's, who at the time referred to was about 15 years old, testified in effect as follows: It was between sundown and dark when Judge Lewis sent the message to have Sally brought to town for him and his wife to see. The witness was not present when the message came and therefore could not say who brought it; she was out where they were milking and the children came out there and told her. "In the morning mother wanted me to go up town on some business that she had; I went up there, and we heard or I knew that Sally was going over to the hotel. I done my trading and Sally came along—her and father—going out to the graveyard; I went with them out there. . . . Then we went back to the hotel. . . . Now, did you hear any conversation between Judge Lewis and your father concerning Sally? A. I did. Q. Tell what it was? A. As they were fixing to leave for Albany, Judge Lewis—I heard Judge Lewis tell my father that he would do as he said —that he would adopt Sally as his child and that he would educate her, and, at his death, she should heir equal with his heirs. Q. Was this at the hotel or farm? A. That was in front of the hotel. . . . It was just as they were fixing to leave in the buggy. . . Q. What did your father say? A. He said: 'If you will do that, Judge Lewis, I will give her to you, feeling it is my duty and the best I can do for Sally' . . . He shook hands with Mr. and Mrs. Lewis, and, when he went to shake hands with Sally, she was on the other side of the buggy from him, and Sally hopped down from the buggy

and went around to the side father was on, and dropped down on her knees, and kissed him good bye, and when they parted, she was crying and so was he." On cross-examination she was asked if she was sure she had repeated the exact words of the conversation, she said, "No; not exactly word for word. But that was the meaning all right."

The next witness to the alleged contract was the daughter of the hotel-keeper who had received the plaintiff when she came to the hotel and took her in charge to touch up her toilet. This witness was fourteen years old at the time. She stated that she had heard the conversation between Judge Lewis and Mr. Kelim at the hotel and was asked to state the conversation, she said: "Well, Mr. Lewis sent for Sally and she came there. He—this is the way I will state it; I want to be correct about it: He sent word for her and they had a conversation there. He said he had come up to adopt Sally. Is that what you want to get at? . . . They came there, Mr. and Mrs. Lewis, from Albany, and when they came they said they had come to adopt Sally Kelim. . .. . By the Court: 'You heard him say that to your father? A. Yes, sir. Emphatically. . . . . Q. Now, after they came, state what was said there between Judge Lewis and Uncle Asa Kelim? A. Uncle Asa said that he could have her but no other person could and no person could have her without they would adopt her. . . . Judge Lewis said: 'I want to take her and adopt her and raise her as my own, I don't want to take her unless I can take her that way.' " The witness then went on to corroborate what the brother had testified to about his proposing to Judge Lewis to take Sally on six months' trial, and also about the younger brother crying at the thought that her name would be changed and Judge Lewis soothing his apprehension on that point. Then the witness said: "They talked this matter over—the adoption papers.

They talked over about adopting her, they said they would not take her that day, but she could go back to uncle Asa's and stay all night with the family, and get her things ready and they would go down the next day after her." Witness then said that Judge and Mrs. Lewis went down to Mr. Kelim's the next morning and brought the child back with them, and when they got there Asa Kelim and his daughter, whose testimony is above given, were there to meet them.

We do not feel justified in consuming more space with the plaintiff's evidence, the above is the strongest that was adduced at the trial to support her claim.

The general character of the evidence is of the most unreliable, that is, it rests alone in the memories of the witnesses attempting to recall conversations which occurred thirty years ago when they were fourteen or fifteen years old. Common knowledge of the natural infirmity of human memory admonishes us to always receive such evidence with great caution; even when we credit the witnesses with usual memories and common honesty we must charge them with common human infirmity. Perhaps the contradictions and discrepancies that appear in the different statements of the different witnesses are attributable to the infirmity of memory, but if so, it renders their testimony on the whole no less untrustworthy; the plaintiff cannot ask us to excuse mistakes in their testimonies on certain points because of the natural frailty of human memory, and at the same time ask us to take as exact truth that which is essential to her case which rests on the same frail foundation.

According to the hotel-keeper when Judge Lewis arrived he at once said that he had come to adopt Sally Kelim and asked where she was, implying that up to that time he did not know where she was. The witness gave him the information that she was at her Uncle Asa's and he sent a message there by some one, he did

not remember who it was, and they came to the hotel, the uncle, the two boys and the girl, and stayed there "pretty near all day."

According to the brother's testimony he happened to be passing the hotel just at that time and the keeper came out and "asked me where Sally was; I said she was down at Uncle Asa's and he said Judge Lewis is here and wants to get her and adopt her." According to this witness when the uncle, the two boys and the girl arrived at the hotel the girl was taken to another room, but the uncle and the two boys were ushered into the room where Judge and Mrs. Lewis were, and Judge Lewis asked where Sally was and on being told that she would be in in a few minutes he said that he had come to take her to raise and educate but would take her on no condition except to adopt her; the witness proposed six months' trial but Judge Lewis would not hear to that, it was absolute adoption or nothing; then the uncle said he would give her up to Judge Lewis if he would adopt her, but on no other terms. If the testimony in support of this claim is in any part made up, the fact that the plaintiff's name was never changed but she was always known by her own name, Sally Kelim, an unusual fact in case of a real adoption, we would expect that fact to be accounted for, and this witness has attempted to account for it. The contract as testified to by the witness was crisp in its terms and was quickly agreed to. Judge Lewis began the negotiations by laying down his ultimatum, and it turned out that that was the ultimatum of the uncle also, so there was no difficulty in coming to terms. Then the uncle produced his letters of guardianship. According to this witness this occurred before the little girl had been brought into the room, but according to the testimony of the hotel-keeper's daughter it occurred after she had arranged the child's toilet and brought her in the room, for she heard it all.

According to the brother the agreement was concluded that day and they parted with the understanding that Judge Lewis and his wife were to call the next morning at the farm to get the little girl and take her to their home. Yet it would seem that when Judge Lewis and his wife came to the farm the next morning it was still a question whether he would be allowed to adopt the child because the same witness says one of the first questions Judge Lewis asked Mr. Kelim was: "Are you ready to sign the adoption papers?" and Mr. Kelim said, "Yes, I am ready to sign them up to you, but I would not let anybody else have her. It grieves me awfully to sign away my right to her; but I will do it for you." When this witness was testifying, as his cross-examination shows, he was under the impression that if adoption papers were to be executed it was his uncle who was to sign them. This was doubtless the opinion of the other witness also who claimed to have been present at that scene and undertook to tell what occurred; in his deposition taken before the trial his recollection then was that Judge Lewis's question was, "Are you willing to sign the papers that we spoke of, giving me the care and control of this child?" So that, according to both these witnesses, it was still an open question that morning whether the uncle was willing to part with the child and if that is so then the agreement was not concluded the day before at the hotel. A very significant difference appears in the testimonies of these two witnesses; they both professed to have heard the same question propounded by Judge Lewis, one thinks the words "adoption papers" were used, the other "the papers that we spoke of, giving me care and control of this child." Crediting each with a desire to speak the truth, one, at least, is at fault in his memory on a very essential point—"adoption papers" signify one thing, papers "giving me care and control of this child" signify quite a different thing.

A long time has elapsed, boyhood and girlhood have now developed into middle-aged manhood and womanhood, the best of human memory is fallible, and if these two witnesses recollect what was said of the papers so differently why may not they and the other witnesses be honestly mistaken in the words used in the conversations? If papers for the uncle to sign were mentioned on that occasion there is more reason to conclude that the witness was correct who said they were papers giving Judge Lewis care and control of the child, for such were the only papers there was any occasion for the uncle to sign. A learned lawyer would have understood that he was uttering nonsense to have spoken of the uncle signing "adoption papers."

To complete the scene at the farm house that morning: According to these two witnesses there were no papers produced or signed (at least they make no mention of it), but the little girl was brought out, her brothers and uncle bade her goodbye, she was put into the buggy with Judge and Mrs. Lewis, and they drove away.

The witness who was the daughter of Asa Kelim, and was, at the time in question, about fifteen years old, remembers the event quite differently from the others, that is, as to time and place, but she recollects the essential words exactly as they do and gives them in the same form. We gather from her testimony that if Asa Kelim took the little girl and her two brothers to the hotel on the day before Judge Lewis came to the farm for her as the other witnesses testify, this witness did not know it. She was at home and out where they were milking when some of the children came out there and told her that a message had come from Judge Lewis to bring Sally to the hotel, and she said it was between sundown and dark. This witness takes up the scene the following morning, not at the farm, but in the town. Her mother had sent her up town that morning

on some business, which she attended to, and then she met her father and Sally, and they three went out to the graveyard, having first obtained a rose plant from one friend and a spade from another; then after planting the rose they returned to the hotel and Judge Lewis and his wife were getting ready to go to Albany, taking Sally with them. When they were in the buggy in front of the hotel ready to start the agreement on the one side to adopt and on the other to give up the child was reiterated. Then the parting came, Mr. Kelim shook hands with Judge and Mrs. Lewis and extended his hand to Sally, but she jumped out of the buggy and ran around to her uncle and kneeled down before him and kissed him goodbye. Why she should kneel down to kiss him is not explained, probably the peculiarity of the act fixed it in the memory of the witness. It was peculiar. It is difficult to reconcile the testimony of this witness with the statements of the other witnesses concerning the meeting of the parties at the hotel the day before, Judge Lewis's going to the farm the next morning (the same morning that this witness speaks of), the parting scene at the farm and the driving away in the buggy. There is no concurrence on any point with the other witnesses except the essential point that Judge Lewis declared that he would adopt Sally.

The testimony of the witness who was the hotel-keeper's daughter still further confuses the subject. We have seen according to the testimony of two witnesses what occurred at the farm, the parting there and the departure of Judge and Mrs. Lewis with the child, leaving the uncle there. Yet according to this witness, when Judge Lewis with his wife and the child in the buggy reached the hotel, the uncle of the child and his daughter were already there to meet them, and not only that, but, according to the daughter's testimony, Sally was there too, and, stranger still, they had been

up town long enough for them to have made the pil-
grimage to the graveyard and return.

This testimony of the plaintiff's witnesses as to
the contract is not satisfactory, even standing alone
without reference to its application, but when we come
to apply it to a man of the character and habits of
Judge Lewis it is still less satisfying. The learned
counsel for the plaintiff in their brief say: "He was
honest and fair in his dealings, very intelligent, but
very secretive. His most intimate friends did not un-
derstand him and knew but little of his transactions."
And yet we are asked to believe that in an important
matter like this, affecting not only his business, but
penetrating into the sanctity of his family, he was not
only communicative but he took the whole community
into his confidence. On his arrival at the hotel he in-
forms the landlord that he has come to adopt Sally and
asks him to send for her; not only in the public room of
the hotel does he make the statement, but even out on
the street, opposite the hotel, in a promiscuous gather-
ing, of whom the witness who told of it was a sample
and he suffered an unseemly jest to be made of the
occasion; every where he went he proclaimed it. We
cannot believe it, the witnesses have been mistaken.

In her petition the plaintiff says that while she
lived in his family Judge Lewis frequently told her
that she had been legally and lawfully adopted by him
and at his death she was to have an equal share of his
estate with his own child. There was no proof to sus-
tain that averment, but the averment itself in
the petition in the light of the facts weakens
the plaintiff's case. Take the character of the
man as portrayed in the words of the plaintiff's
learned counsel and, without crediting him with
even one kind sentiment, say of him only as the
counsel have said: "He was honest and fair in his
dealings," and then believe, if you can, that while he

was rearing this child in the bosom of his own family, he often told her that she had been legally and lawfully adopted and at his death would share equally with his own daughter in his estate, well knowing that the statement was not true and raising in her expectations that he knew could end only in cruel disappointment.

There is nothing in the undisputed circumstances of the case that would indicate that a moral duty lay on Judge Lewis to do more than he did for the plaintiff. The witnesses say that the uncle said he would not part with the child unless Judge Lewis would agree to adopt her, that is, he would not allow Judge Lewis, a man of wealth and high social standing, and for whom he had a high regard, to take the child into his family and give her advantages of education and refined rearing, which she could not have in his home, unless she was adopted. That testimony casts an imputation on the character of the plaintiff's uncle. Why should he not have been willing to give the child that better advantage? It was all that her mother on her death bed had requested him to do, according to the plaintiff's own petition. If he had denied the child that advantage, if he had refused to let Judge Lewis take her to rear and care for, and if he had kept her in his own home because it gave him pain to part with his own flesh and blood as the witness said, could he have justified his own act in his own conscience? And it is equally incredible that Judge Lewis should have insisted on adoption as the only condition to rearing her; the uncle was the guardian, but if he was willing to let the child go the guardianship could easily have been changed if Judge Lewis had thought it worth while or if he feared any interference. And lastly, in this connection, the fact is that Judge Lewis, the methodical, careful lawyer, the just and upright man, never executed any deed of adoption, never changed the name of

the child, but he did give her a good home, he did rear her in the bosom of his own home and brought her forth a refined and well-educated woman, the social equal of the best in the land. We are satisfied that he did all that he agreed to do.

Passing from a consideration of the testimony going to show an oral contract to adopt, let us see what there is in the case to establish part performance. The plaintiff's testimony shows a condition consistent with the theory that there was a contract to adopt; that is as much as plaintiff can claim for it, it does not show a condition inconsistent with any other theory.

When a court of equity is invoked to enforce an oral contract void under the Statute of Frauds on the ground of part performance, it recognizes and appreciates the danger that the statute was designed to avoid and grants relief only when it is sure beyond a reasonable doubt that to refuse its aid would result in allowing the statute to be made in that case an instrument to protect fraud. A court of equity, therefore, requires that a part performance relied on to take the case out of the statute should be of a character not only consistent with the reasonable presumption that what was done was done on the faith of such a contract, but also that it would be unreasonable to presume that it was done on any other theory. Can it be said that the mere fact that an orphan child in indigent circumstances was taken into the family of comparatively wealthy people, reared and educated even on an equality with their daughter, is reasonably consistent only with the theory that she was an adopted child—consistent only with the theory that at his death his own daughter should make equal division with her of the estate which was the product of his whole life's work? If that is so, how dare a man take such a child into his family? It is said in the brief for appellant that declarations made by Judge Lewis in his lifetime to the effect that

he had merely taken the plaintiff to rear and educate, were self-serving declarations and incompetent as evidence. If that is so then the danger is greatly increased. The law provides for the making of a deed of adoption and placing it on record, but it makes no provision for the writing and placing on record, by the man who takes an orphan child into his family, of a proclamation to the world that he has not adopted the child.

Appellant contends also that Mrs. Holden, the only child of Judge Lewis and the only surviving member of the family, is incompetent as a witness in this case; if that is so it only further illustrates the wisdom of the requirement in a case like this that the evidence for the plaintiff must be clear, consistent, convincing beyond a reasonable doubt.

To say that the testimony in this case does not measure up to the standard we have laid down in such cases does not necessarily impeach the veracity of the witnesses; it implies rather that, taking all the circumstances together, the probabilities are that they have not accurately remembered the conversations they think they heard thirty years ago when they were but fourteen and fifteen years old.

It is insisted that the court erred in allowing Mrs. Holden, the daughter of Judge Lewis, to testify, and also in admitting evidence of statements by Judge Lewis to the effect that he had only taken the plaintiff to raise. We do not deem it necessary to go into those questions, because we have not considered either the testimony of Mrs. Holden or the testimony of the so-called self-serving declarations of Judge Lewis. We have considered the case as to the alleged contract on the plaintiff's evidence alone, and whilst we hold that it was evidence tending to prove the alleged oral contract and therefore plaintiff was entitled to have it weighed, yet when weighed and applied to the undis-

puted facts of the case we have found it not sufficient.

The chancellor took the correct view of the case. The judgment is affirmed. *Lamm* and *Graves, JJ.,* concur; *Woodson, J.,* not sitting.