NETTIE STEWART, Administratrix, Respondent, v. NELLIE STOKES, Appellant.

Kansas City Court of Appeals, March 2, 1914.

1. **EXECUTORS AND ADMINISTRATORS: Gifts Causa Mortis: Evidence: Reasonable Doubt.** Evidence sufficient to sustain a gift *causa mortis* must be more than a preponderance or greater weight. It must be of such undoubted character as to force conviction to the judicial mind beyond a reasonable doubt. It is better that gifts actually made shall fail for want of *quantum* and character of evidence than that restraints thrown around men *in extremis* be removed and temptation to plunder be admitted. This was held in a case where a sister claimed that her dying brother with a family of his own, while away from home, gave her his diamond ring and gave to her for her father and mother a draft for $1000 and for her other brothers $300 in money.

2. **EVIDENCE: Separate Gifts.** Where it is claimed that one has made a separate gift *causa mortis* to each of three persons present in the death chamber, whether each is competent to testify in favor of the other gifts, but not his own, was not decided.

Appeal from Carroll Circuit Court.—*Hon. Francis H. Trimble,* Judge.

AFFIRMED.

*L. H. Waters* and *Busby Bros. & Withers* for appellant.

To constitute a valid gift *inter vivos* there must be an intention to give and a delivery to the donee, or to some one for him, of the thing given. Tolmes v. Baker, 156 Mo. App. 405; Estate v. Soulard, 141 Mo. 656-7; Foley v. Harrison, 233 Mo. 517. The gift may be made to a third person for the donee, and if beneficial to him, acceptance will be presumed. Dole v.

Lincoln, 31 Me. 422; Devoe v. Dye, 123 Ind. 321; Darland v. Taylor, 52 Ia. 503.

*Jones & Conkling* and *Lozier & Morris* for respondent.

ELLISON, P. J.—Plaintiff is the widow of A. W. Stewart and is administratrix of his estate. She instituted proceeding under the statute against defendant (who is a sister of her deceased husband) to discover property or assets of the estate. Defendant's answer disclosed that she had a diamond ring, a draft for $1000 and $300 in money, but claimed deceased, shortly before his death, had given the ring to her, the money to two brothers and the draft to the father and mother. A trial in the probate court resulted in plaintiff's favor, and on an appeal to the circuit court judgment was again rendered for her.

It appears that deceased resided in Bosworth, Carroll county within about seventy-five miles of Kansas City. He was owner of a drugstore which an employee conducted for him until a few days before his death when he sold it. A wife and one child four or five years old composed his family. He was in the last stage of consumption and on the afternoon of October 20, 1911, he left Bosworth for San Antonio,

Texas, by way of Kansas City, Missouri, and arrived there that afternoon and was met by his brother who took him to the house of their father and mother who resided there. He intended to go out that night with a friend who was going also but was too weak to continue his trip and a physician was called. He died on the evening of October 23rd, the third day after his arrival. The gift of the property was said to have been made when no one was present save defendant and her father and mother and it was about an hour before his death; and, if made as claimed by defendant, was undoubtedly a gift *causa mortis*.

Interrogatories were propounded to defendant and they with the answers are here given:

"Interrogatory No. 3: Have you that ring now in your possession? if so, state how, when and where it came into your possession."

"Answer: I now have said ring in my possession. My brother, said A. W. Stewart, took this ring off his finger and handed said ring to me saying 'Nellie I want you to have this and wear it.' This occurred on October 23, 1911, at my home 2619 Holmes Street, Kansas City, Missouri."

"Interrogatory No. 8: Have you said cash or any part thereof in your possession? If so, state how, when and where you received it, and the exact amount you received."

"Answer: On the 23rd day of October, 1911, my said brother A. W. Stewart told me to go to his bedroom and get out of the right-hand pocket of his pants and bring to him a roll of bills, which I did; he took said roll of bills and unfolded same and then he refolded said roll of bills and handed the roll of bills to me saying 'give this to the boys' he meaning his three living brothers Henry L., James E., and Frank C. Stewart to whom he always referred to as 'the boys.' I place said roll of bills in my shirtwaist, and my said brother told me 'not to put said roll in my

waist, you will lose them out of it, put them away.'
Then I placed said roll of bills in my dresser drawer
in my room. On October 24, 1911, when I took said
roll of bills out of said dresser drawer and counted
the same said roll of bills contained $300 and no more.
I then placed said $300 in my money bag, after which
I told 'the boys' my said brothers above referred to
of my having said money and what my deceased
brother said to me as above stated at the time he gave
said money to me, and 'the boys,' my said brothers,
told me to keep the said $300 and spend it for the bene-
fit of our father and mother James E. Stewart and
Lou Stewart; that I have spent eighty-five dollars of
said money for the benefit of father and mother by way
of general household expenses, the remaining $215 of
said amount is now in my possession.''

''Interrogatory No. 14: Have you said draft now
in your possession? If so, state from whom you re-
ceived it and when and where.''

''Answer: On October 23, 1911, my brother A. W.
Stewart told me that he had a draft in his vest pocket,
and for me to go to his bedroom and get it and bring
it to him which I did. Then he told me to get a pen
and ink so he could sign it. I got him ink and a pen,
then he said he did not believe he could sign it so his
name could be read, and then he requested me to write
his name and that he would make his mark, which he
did, and then he requested mother and I to witness his
mark, which we did; he then folded up the draft and
handed it to me saying at the time this is for Pa
and Ma to live upon, said draft is now and has con-
tinuously been in my possession since it was delivered
to me by my brother as above stated.''

The answers of Mrs. Lou Stewart (the mother)
to same interrogatories were substantially the same
as the answers of appellant, and the answer of James
E. Stewart (the father) to 18th interrogatory was as
follows:

Answer to 18th: I was present when A. W. Stewart gave my daughter a diamond ring, he at the same time told my daughter to take it and wear it, it was hers and she did take it."

Defendant offered evidence at the trial tending to to support her claim. This evidence, or rather that portion of it which was intended to show what took place between deceased and defendant at the time of the gift, was the testimony of defendant and her father and mother. Objection was made to their competency on the ground that they were the donees of the gifts and, the other party being dead, were disqualified under the statute. (Sec. 6354, R. S. 1909).

Some of these offers were admitted, especially as to the ring and afterwards excluded. Other offers of evidence as to the other articles are set out in the record in detail and they were excluded. It is all substantially as contained in defendant's answers to interrogatories which we have quoted above. In view of our conclusion it will not be necessary to pass on the competency of the witnesses. But assuming them to be competent, their testimony connected with other undisputed facts and circumstances, is not sufficient to support defendant's claim. We will therefore consider such evidence and the offers of proof as though all had been regularly admitted.

The rule is that in circumstances here disclosed, a party claiming a death-bed gift of valuable property and thus diverting it from its lawful descent and from the course of primary affection (in this case a wife and little boy) must have evidence so free of suspicion as will convince the judicial mind beyond any reasonable doubt that the gift was made as claimed. Ordinary preponderance, or weight of evidence will not answer. So easy would it be for those in the privacy of the death chamber to absorb the sick man's jewels, notes, stocks, bonds and other property, if no protection was offered, that the law has put up every safe guard against such

possibility. At one time, such gifts were invalid, in the civil law, unless attested by five witnesses, and though this caused many to fail that were really intended by the donor, it was thought better to suffer that injustice since it was small, as compared to the wholesale plunder sure to follow the removal of such restraint. [Foley v. Harrison, 233 Mo. 460, 582, 583, 584; Wales v. Holden, 209 Mo. 558.] In the first of these cases the Supreme Court said of such claims, that "the evidence adduced to establish any of them in a court of justice should be weighed in the most scrupulous manner, and .pronounced wanting whenever its overwhelming probative force is lacking and fails to convince the judicial mind of its truthfulness beyond a reasonable doubt."

Applying this strict cautionary rule to the evidence in this case we find it insufficient to make out a gift. It is worthy of note that though the deceased was found to be unable to proceed upon his trip and was with defendant and other relatives in what may be said to be a dying condition, no one communicated with his wife and child, or friends ot Bosworth; and the wife knew nothing of the gravity of the situation until, not hearing, she, on the afternoon of the evening of his death, called up defendant's mother, or one or both of her sisters-in-law on the telephone and then first learned of his condition, and that he had not gone to San Antonio. She then had a telephone conversation with defendant and began getting ready to go to Kansas City. A train stopping at Bosworth would not be due before next morning, but her friends got an order for an evening train to stop for her and in that way she got in that evening about three hours after her husband's death. Defendant and the others were surprised at her quick arrival. When she went to a bedroom she found deceased's suitcase on a trunk with part of the contents spread out on the bed. The suitcase was empty. Defendant did not have the ring on

her finger but as she was leaving the house that night with her brother, plaintiff accidentally met her in the hall and noticed that she had the ring. Plaintiff was not told of these gifts. On the contrary when she asked the mother what had become of the ring the latter answered she "did not know," but supposed "Frank or Nellie (defendant) had it." And though inquiry was made as to his money there was no claim of a gift.

The draft was presented for payment to the Traders Bank of Kansas City on which it was drawn on the next afternoon after deceased's death, by a woman representing herself to be a sister of deceased. She was accompanied by a man, but neither was known to the bank official to whom it was presented. He examined the draft and refused to pay it. At that time it had deceased's name written on the back and at the end of the name was a cross mark, but there was no witness to the signature, as stated by defendant.

The next day, the day of the funeral at Bosworth, defendant, in company with her brother and his wife, presented the draft to the bank at Bosworth which had issued it to deceased. The cashier refused to pay it. At that time there were two names endorsed on it, purporting to attest or witness deceased's signature, and one of these was defendant's.

The early presentation of the draft at Kansas City for payment before the funeral, under such circumstances as that payment was refused, and its presentation again next day at Bosworth in a changed condition and the extraordinary circumstance unreasonable in its nature, that he should give away his money ($300 was what he drew from the bank as he left Bosworth) and the draft, when he was away from home, thus leaving nothing, either to take him home, or to San Antonio, if he thought he would live, or to take his body home for burial if he thought he was dying, is enough to arrest serious attention. And why

he should have given the draft to defendant "for Pa and Ma," when they were present to receive it direct, the mother having attested his mark in the assignment, is indeed strange. These things, together with the silence of plaintiff as to the gifts and the hurry for the fruits of the draft, with other circumstances, deprive the evidence of that support needed in cases of this kind.

If there were really gifts, as claimed by defendant, it is better, as said in Foley v. Harrison, supra, that they fail for lack of evidence of sufficient legal strength, than that the rules of law guarding the property of men *in extremis* be loosened in individual cases.

The judgment is affirmed. *Johnson, J.,* concurs. *Trimble, J.,* having tried the case below, not sitting.