MARQUISE KIDD, *nee* MARQUISE KLEPPER, and JAMES M. KLEPPER v. ST. LOUIS UNION TRUST COMPANY and FRED G. ZEIBIG, Trustees, et al., Appellants.—74 S. W. (2d) 827.

Division One, September 18, 1934.*

*NOTE: Opinion filed at May Term, 1934, July 17, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.

*Bryan, Williams, Cave & McPheeters* and *Bush & Bush* for appellants.

*Roberts P. Elam* for respondents.

STURGIS, C.—The plaintiffs in this case claim to be the adopted children of Harry I. Klepper, deceased, and as such are suing for his estate, real and personal, in the hands of the two defendants above named as trustees under his will. The other defendants are the collateral heirs, sisters and their children, of Harry I. Klepper, deceased, as well as devisees under his will. The suit is really to determine title to the estate of Harry I. Klepper, deceased, as between plaintiffs, claiming to be his adopted children and pretermitted heirs under his will, and the defendants, his collateral kindred, claiming under his will. In form the suit is by plaintiffs praying the court to enter a decree establishing the relationship or status of plaintiffs to be that of adopted children and heirs of Harry I. Klepper, deceased, and as such to be pretermitted heirs and entitled to his estate. The trial court so decreed and defendants have appealed.

The petition alleges and the evidence shows that Harry I. Klepper died in St. Louis on July 7, 1927, possessed of a considerable estate, unmarried and without natural children or descendants, leaving a will, duly probated, by which he devised all his property to the above-named trustees, who were also made executors of the will, in trust for the benefit of his four named sisters, defendants herein, for life with remainder to his legal heirs. As the source of plaintiffs' right and title to the estate of Harry I. Klepper, the petition alleges that plaintiffs "are the legally adopted children of the said Harry I. Klepper; that in the year 1910, when plaintiff Marquise Klepper Kidd was about the age of thirteen, and plaintiff James M. Klepper was about the age of eleven years, and when plaintiffs were in the exclusive custody and control of their mother, Mrs. Ola E. George, the said Harry I. Klepper, in consideration of the said Ola E. George consenting to marry him, promised, contracted and agreed with the said Ola E. George that he, the said Harry I. Klepper, would adopt her said children, these plaintiffs, and would make them his heirs and would in all manner and respects consider, keep and treat them as his lawful children. That the said Ola E. George and the said Harry I. Klepper, in pursuance of said contract and agreement, were thereafter married on July 3, 1910; that in further pursuance of the said contract, promise and agreement, as aforesaid, the said Harry I. Klepper, immediately after said marriage, with the consent and acquiescence of the said Ola E. George, procured and took the custody and control of plaintiffs as his own children, and changed the

names of the plaintiffs from Marquise George and James George to Marquise Klepper and James Klepper, respectively; that the said Harry I. Klepper thereafter treated the plaintiffs as his children, introduced them and spoke to others of them as his children, in every respect acted towards and concerning them as his own children and represented and stated to the plaintiffs and other persons that he had adopted the plaintiffs as his own children, and that the plaintiffs were to have and would have his property when he died; and that the said Harry I. Klepper supported, cared for and educated the plaintiffs as his own children. That by the acts and conduct of the said Harry I. Klepper plaintiffs were led to believe and did believe that they were the adopted children of the said Harry I. Klepper, and plaintiffs never knew any other father than the said Harry I. Klepper.''

The petition alleges other facts and circumstances tending to show complete performance of the contract of adoption, so far as plaintiffs and their mother are concerned, and that ''plaintiffs, as the adopted children of said deceased in accordance with the statute of Missouri upon that subject made and provided, became, were and are the lawful children of the said Harry I. Klepper and as such entitled to inherit his estate; that the said Harry I. Klepper did not name or provide for them as his adopted children in his said will, and plaintiffs aver that the said Harry I. Klepper died intestate as to these plaintiffs; that on the — day of May, 1914, the said deceased deserted and abandoned the plaintiffs, since which time they have supported and maintained themselves.''

The prayer of the petition is to enforce the said contract of adoption as above stated and to decree and declare plaintiffs the adopted children of said Harry I. Klepper, deceased; to fix, establish and declare the status of the plaintiffs herein as the adopted children of said Klepper, and that the said deceased be decreed to have died intestate as to these plaintiffs, and that they be duly invested with all the rights and privileges of adopted children, and that the title to all of the property of every kind and character which the said Harry I. Klepper, deceased, owned and was seized and possessed of at the time of his death, by proper decree of court, be duly vested in these plaintiffs as the adopted children of said Harry I. Klepper.

The question presented here is the sufficiency of the evidence to establish the alleged parol contract of adoption of these plaintiffs as adopted children and heirs of Harry I. Klepper. There was no deed or written contract or writing of any kind evidencing an adoption or any court proceeding establishing that status. The material facts are these: In May, 1910, Harry I. Klepper was a widower, aged fifty-three, of something over a year's standing, living in St. Louis. His wife had died leaving him without children or descendants. At that time Ola E. George, mother of these plaintiffs, was a widow, aged thirty-seven, following the business of nursing in St.

Louis. Her husband had deserted her several years previous leaving her to support her two children, plaintiffs herein, as best she could, and she had procured a divorce. One of the plaintiffs, Marquise, was a girl aged thirteen, and the other, James, a boy, aged eleven. She had placed these children in an orphanage in St. Louis but contributed to some extent to their support and in large measure retained control of them. Klepper was a man of considerable means. The two became acquainted at the suggestion of a mutual friend, a St. Louis policeman, and first met each other at the corner of Olive and Grand streets in St. Louis on May 9, 1910. They were married in Minnesota July 3, 1910, where Klepper owned and maintained a summer home, both parties going there for that purpose. It was during this brief courtship of less than two months and in connection with and in consideration of plaintiffs' mother consenting to marry Klepper that he is alleged to have contracted and agreed to adopt these two children of his intended wife. The evidence is that during this brief courtship Klepper visited and became acquainted with these two plaintiffs, arranged to take them out of the orphanage and go with their mother to Minnesota to be present at the marriage and to make their summer home there with their mother and stepfather. Klepper furnished money to plaintiffs' mother for this purpose.

There is no doubt that but Klepper, on marrying the mother, intended to and did in fact take her children, these plaintiffs, into his home as members of the family and supported and educated them during nearly four years. Klepper and his family, composed of himself, his wife and these two children, lived at his summer home in Minnesota during the summer season and during the winter season lived where the children could attend school—the first winter at Lincoln, Nebraska, and afterwards at St. Louis. The children attended school, were educated in music, etc., all at the expense of Klepper. He treated them as his children, introduced them as such, and they took his name and were known as Marquise and James Klepper. Klepper was fond of hunting and fishing and indulged in these sports not only at his summer home on a Minnesota lake but at other places and times. This and his attention to his business interests caused him to travel and be away from home much of the time. He corresponded with his family, his wife and these two children, and his correspondence with them, many such letters being put in evidence, showed that at least during the first two years or more of his married life he not only provided well for the family, including plaintiffs, but manifested a proper devotion to and interest in them.

All the evidence shows that Klepper was a quiet and rather reticent man, forming and carrying out his own plans without telling or consulting others or seeking advice. So it was that as quietly and quickly as he met and married Mrs. Ola George in 1910, so in May, 1914, less than four years after the marriage, he left and sepa-

rated from her as quietly and mysteriously, so far as this record shows, as was his marriage to her. If the plaintiffs or their mother knew the cause of his separating from her they did not disclose same at the trial. This separation was followed by a suit for separate maintenance brought by plaintiffs' mother, Ola George Klepper, and later by a suit for divorce and alimony based on desertion, both resulting successfully for plaintiffs' mother and which we will have occasion to mention later. We note now that the separation took place in May, 1914, but the decree of divorce and allowance of alimony in gross for $15,000 was in 1918, and Klepper died July 7, 1927. His estate was settled in the probate court in March, 1930, and the present suit was filed September 18, 1930, twenty years after his marriage to plaintiffs' mother, at which time it is claimed he made the. contract with her to adopt plaintiffs as his children. When Klepper separated from plaintiffs' mother. in May, 1914, he did so completely and finally and just as completely and finally severed all relations and communications with these plaintiffs. The support, maintenance, and alimony which Klepper thereafter paid was to the mother. Neither of the plaintiffs testified at the trial of this case but relied almost entirely on the testimony of the mother to make a case for them. While there is some corroborating evidence which we will note later, it is the mother's evidence which is relied on to prove that Harry I. Klepper contracted with her, in consideration of her marriage to him, to not only take her two children into his family, assume all the obligations of a father as to their support, maintenance and education during their minority, but also to adopt them as his children and heirs so as to take his property at his death. Is the evidence sufficient in this respect?

The objection was made at the trial that as plaintiffs' mother was one of the parties to the contract of adoption, to enforce which this suit is prosecuted, and the other party to such contract was dead, she was not, under our statute, a competent witness to prove such contract. Such was the earlier rulings of this court in Nowack v. Berger, 133 Mo. 24, 37, 34 S. W. 489, and Asbury v. Hicklin, 181 Mo. 658, 671, 81 S. W. 390. These cases seem to have never been, directly at least, criticised or overruled, but it is said that they have been inferentially overruled by later rulings of this court to the contrary. [Signaigo v. Signaigo (Mo.), 205 S. W. 23, 29; Craddock v. Jackson (Mo.), 223 S. W. 924, 926; Taylor v. Coberly, 327 Mo. 940, 38 S. W. (2d) 1055, 1060.] As appellants do not press this point and have not briefed it here, we will not reopen the question of the competency of the plaintiffs' mother as a witness.

Holding that plaintiffs' mother is a competent witness whose evidence must be weighed in the balance, we should also remember that the lips of the other party to that contract are sealed by death, and as said by Judge VALLIANT in Wales v. Holden, 209 Mo. 552, 577, 108 S. W. 89, in considering this same question, "If that is so it only

further illustrates the wisdom of the requirement in a case like this that the evidence for plaintiff must be clear, consistent, convincing beyond a reasonable doubt.'' We must also keep in mind that because of the frailty of oral evidence and the inclination of interested parties to favorably word and shape their evidence as to what was actually said by the parties in making a claimed contract, especially where there is no possibility of contradiction by the other party, the law requires contracts of this kind to be in writing and that such contracts are without the Statute of Frauds only when part or complete performance of the same takes them out of the ban of such statute. It is only when such contracts have been so far performed by one of the parties that it would work a positive fraud on such party to allow the other to invoke the rule requiring the evidence to be in writing to establish same, that such rule is dispensed with and oral evidence is heard to support such a contract. It is only when the oral evidence supporting the contract is clear, cogent and convincing, free from doubt and banishing all reasonable doubt to the contrary that such contract, when supported by oral evidence only, will be enforced; and then only when to do otherwise would work a palpable fraud on the party who has performed his part of the contract in reliance on it. In the case last cited it was said: ''The circumstances of this case forcibly illustrate the wisdom of the rule of evidence so firmly established and so often declared by this court, namely, that the proof to sustain a claim of this kind, in the face of the Statute of Frauds, must be *overwhelming* in its probative force, leaving no room for a reasonable doubt. We do not consider it necessary to discuss that rule at this time; we can add nothing in the way of argument to what we have already in many cases said. [Cases cited.]'' And further this is said: ''When a court of equity is invoked to enforce an oral contract void under the Statute of Frauds on the ground of part performance, it recognizes and appreciates the danger that the statute was designed to avoid and grants relief only when it is sure beyond a reasonable doubt that to refuse its aid would result in allowing the statute to be made in that case an instrument to protect fraud. A court of equity, therefore, requires that a part performance relied on to take the case out of the statute should be of a character not only consistent with the reasonable presumption that what was done was done *on the faith of such a contract*, but also that it would be unreasonable to presume that it was done on any other theory. Can it be said that the mere fact that an orphan child in indigent circumstances was taken into the family of comparatively wealthy people, reared and educated even on an equality with their daughter, is reasonably consistent only with the theory that she was an adopted child —consistent only with the theory that at his death his own daughter should make equal division with her of the estate which was

the product of his whole life's work? If that is so, how dare a man take such a child into his family?" And, we may add, how would he dare marry such child's mother? We do not believe that the court stated the rule applicable in such cases too strongly in Asbury v. Hicklin, 181 Mo. 658, 81 S. W. 390, when it said: "When, as in this case, and in consonance with this doctrine a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the Statute of Wills, and of the Statute of Frauds and perjuries, and to set aside a disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the greatest responsibility, perhaps, that ever attaches to his high office. And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the *utmost confidence,* proving the existence of the contract, its terms and conditions, and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of an extraordinary prerogative."

The situation here is quite different than the ordinary case where one person takes into his home, care, custody and control a child of tender years to be reared by him as his own child. Many of the acts and circumstances which ordinarily attest the intention to adopt or make such child his heir, and which the courts weigh heavily in determining the intent of the foster parent, are of no great significance under the facts of this case. It is natural, rather than improbable, that Klepper, when he proposed marriage to plaintiffs' mother and they discussed that subject, intended and agreed that he would take her two children, eleven and thirteen years of age, into their home and would treat them and support and educate them as if they were his own children. They were her children and would continue to be such and on their marriage would become his stepchildren. He would become morally, if not legally, obligated to take them into his home, rear, support and educate them as his own children. In his future treatment of them they would be practically his children, though in law only stepchildren; and in their eyes he became their father. Though not legally bound to do so, at least in the absence of an agreement to that effect, it was natural and to be expected that in becoming the head of the family of which they were a part, he would assume in large measure control and authority over them, and they in turn would yield obedience to him. It is not unusual and is of little significance that as their mother took his name, they would do so also, and that he would call them his children and refer to them and introduce them as such. All this, however, was far short of adopting them as his children and heirs to take his property at his death under the laws of descent and distribution.

The crucial question, as we have said, is whether the evidence is sufficient to show that in consideration of plaintiffs' mother agreeing to marry Klepper and actually marrying him, Klepper in turn agreed not merely to take her two children into his home, support and educate them as if his own children, but also agreed to adopt them as his children and heirs. Agreeing to take the care and control of and to support and educate a child is quite a different thing than agreeing to adopt and make such child his heir, as is pointed out in Wales v. Holden, 209 Mo. 552, 571, 108 S. W. 89. Nor is the part or full performance of the one contract by the parties sufficient to take the other one out of the Statute of Frauds. The performance or part performance of a contract, by the party invoking it, which will remove the bar of the statute, must be referable to and be in fact a part performance of the identical contract sought to be enforced. The contract here sought to be enforced is a contract to adopt these plaintiffs as children and heirs, and the evidence must support that contract so as to leave its making without any reasonable doubt.

 As to the making of such contract, the plaintiffs' mother testified that within a month or so after she met Klepper on May 9, 1910, he definitely proposed marriage to her, though they had discussed this subject to some extent previously. Her version of what was actually said is: "He asked me to marry him. He said, 'I would like to have you be my wife, little woman.' I said, 'Well, conditionally.' He said, 'What?' I said, 'The man that marries me will take my children as his own and adopt them.' He said, 'I will not only be a faithful husband to you, but I will be a devoted father to the children.' He further said, 'I will make them as my own children.' I said, 'Unless they have a home and have a father, I will remain unmarried, for I have had many chances to marry wonderful men, but no man would take my children, and I desire to have a home and a father.'" Repeating this conversation at the court's request, she stated it thus: "He asked me if I would marry him and I said, 'Conditionally, Mr. Klepper.' He said, 'What?' I said 'If I marry a man he will take my children as his own. I have had many chances to marry, but no man ever promised to take my children and make them as his own.' He said, 'I will take them as my own and I will be a faithful husband to you and a devoted father to the children.'" Then this followed: "Q. Mrs. Klepper, I asked you the question, after Mr. Klepper made that statement to you you have already testified to, whether you agreed to that. You said he said he would take the children as his own and as a father. What did you say to that? A. I said that was the thing necessary for me to marry him and to make a home for us." It would seem that while plaintiffs' mother stated the condition on which she would marry Klepper to be that he would take her children as his own and adopt them, he was rather guarded in his reply

and only promised to be a faithful husband to her and a devoted father to the children. In her repetition of what was said, she leaves out the words "and adopt them" and confines her proviso and his assent to taking the children as his own and being a faithful husband to her and a devoted father to her children. If this seems rather critical, rather than getting at the true meaning of what was said, we are strongly impressed by her whole statement of what passed between them that the idea uppermost in the mind of both, and as to which their minds met, was that she was willing to marry him if he was willing to take her children with her into their home, support and give them a home and be as a father to them. This is evident when she said that she had had other chances to marry, but no man would promise to take the children, give them a home and be as a father to them.

The above conversation which plaintiffs claim amounted to a contract of adoption took place at the home of Mrs. Bertha Hirt (later Mrs. Kloeber) in St. Louis where Mrs. Ola George was living at the time, and Mrs. Hirt's evidence affords the only corroborating evidence as to the contract of Klepper to adopt these plaintiffs. She testified: "During the time she lived at my house she treated me and attended me as a nurse. During this time Mr. Klepper came there as a suitor of Mrs. Klepper. He was in that role several months before the marriage in my home. . . . That was several months before the marriage. I started to say, before that Mr. Klepper, at the time he was courting Mrs. George, she said, 'I will marry you if you take my children as your own.' He said, 'I want to adopt them' and told her he intended to. *I will leave that out."* On cross-examination she said: "Mr. Klepper came to see Mrs. George at my home several months before they were married. It was less than a year. I do not know the circumstances under which they met. Mr. Klepper came to see Mrs. George at my home very often, several times a week. . . . He said to Mrs. George before me, 'When you marry me, they take my name, because I certainly want to adopt the children.' That was in front of me and Mr. Hirt. On more than one occasion that was said. Before that conversation I heard statements made in my presence with respect to their intention to marry, which was perhaps a few days before the other time. Mrs. George didn't say she would marry Mr. Klepper at the first conversation. The next conversation was several weeks later. That was the one with respect to the children. . . . I don't know whether it was the first—it was not the first one, I know, but Mrs. George was really considering her marriage. It was with the understanding that he was going to adopt the children. Q. That was just before their marriage, with respect to the children? A. When he offered to adopt them and give them his name. Q. What was said at that conversation? A. I am just telling you to the best of

my knowledge, and I think I told you that. I might not have said it in the same words, but it all means the same thing. Mrs. Klepper asked that—let's see now— Mrs. Klepper wanted to make sure. Q. Don't give impressions. I asked you for what she said, if you recall. A. She said, 'I'll marry you if you will give my children a home.' He said, 'My intention is to adopt these children. They are to take my name when you take my name.' Q. Did you ever hear that conversation at any other time or place than the one about which you have just testified? A. That conversation took place several months before they were married. He spoke of the children at all times that he had a nice home for them." This witness was, of course, attempting to rehearse. a conversation she had heard more than twenty years previous. She was quite positive that Klepper's courtship of Mrs. George extended over a period of several months, though the fact is that their acquaintance was less than two months before the marriage. She was evidently giving her impressions and conclusions rather than any definite recollection of what was actually said. Her daughter, Mrs. Hill, testifying on the same subject, said that Klepper visited the children, these plaintiffs, in the orphanage *before Easter* and that he bought and gave them Easter presents. Another witness, an intimate friend of Klepper, testified that after Klepper's marriage in 1910, he heard Klepper say that he intended or contemplated adopting these children, but that he never stated that he had done so; that Klepper merely said to him that he was contemplating doing so in the future. This, of course, was far from saying that he had adopted them or had contracted to adopt them at the time of the marriage. It implies the contrary.

This is all the direct evidence in plaintiffs' favor as to an actual contract by Klepper to adopt these plaintiffs in consideration of their mother marrying him. And, as we have said, the proof of such contract largely rests on the evidence of plaintiffs' mother. It was said in Wales v. Holden, 209 Mo. 552, 561, 108 S. W. 89, that "In a case of this kind, . . . the characters of the persons whose actions and transactions are under review are important facts to be considered. . . . Knowledge of character, good or bad, is an aid in such case." We are led to say this because of the confessed acts of gross immorality of the then Mrs. Ola E. George in connection with her marriage to Harry I. Klepper. According to her own evidence, she, acting on the suggestion of a St. Louis policeman, went to the corner of Olive and Grand Avenue in St. Louis for the purpose of meeting and becoming acquainted with Klepper. On being introduced she says they all then went to a circus and attended the sideshow and then took dinner at a restaurant. He then took her home but arranged to meet her again the next afternoon, when they attended the same circus, going into the main tent, after which "they went out on Bell Avenue." She said she did not know where on

Bell Avenue they went; "that it was so long ago she did not remember anything about it." She then reluctantly confessed that they went there for the purpose and indulged in sexual intercourse and that this was before any engagement to get married. It was also shown that in the suit brought by her against Klepper after their separation for separate maintenance, she testified, when this matter was not of so vital importance, that she and Klepper went to a room on Bell Avenue on the occasion mentioned and that she "met Mr. Klepper three times before they were married" under the same circumstances as on Bell Avenue. Her only excuse and justification for her immorality was given thus: "Q. And you did that for the reason that you then had already made up your mind to marry Mr. Klepper, did you not? A. I knew we were to be married. Q. You knew you were to be married? A. Yes. Q. There wasn't any doubt in your mind whatever? A. Not a doubt in the world. (By the Court) Q. You mean by that that he had asked you before you went out on Bell Avenue to marry him? A. Well, the first night we met I knew that I had met him before and I knew that we were intended for each other. You don't understand, but I understand. I met him when I was a little girl going East to school, when I was 15 years old. This is not for the world. It is between God and myself. Q. With or without conditions you were going to marry him? A. I knew I was going to be Mr. Klepper's the night before I got off of the car; yes, sir, I knew it; and it has proven the fact. Q. And it didn't make any difference what conditions—that was going to be a fact? A. Yes, I knew it; and it has proven itself. There are some things that are unexplainable. Q. Had he asked you and had you promised him or not? A. I knew the night when I got off that car, when I saw him standing there, I said, 'You are mine.' And when he touched my hand and was shaking hands with me he said, 'Little woman, where in the world have I seen you? I have known you somewhere. You belong to me.' And he couldn't let loose of my arm. He said, 'You belong to me.' And it happened so. You don't understand, but those things are spiritually designed. If you are on a material plane you don't understand. If you have a spiritual intuition you can know what I am talking about, but if you are on a moral plane you don't know what I am saying, and it is nothing but dead words to talk. I knew I was going to marry Mr. Klepper. I couldn't prove it to you, but I knew it. I can't recall any further conversations with Mr. Klepper about marrying him before the conversation at the Hirt home. I am sure that conversation took place in the Hirt home. I can't remember anything that happened in a week or two around there with any definiteness." Again she testified: "I knew I was going to marry Mr. Klepper about the second day after we had met. It was altogether a spiritual understanding. He had not asked me to marry him. I had not

promised to marry him. I knew the first time I ever shook hands with him that he was to be mine. When I went out to Bell Avenue with Mr. Klepper and had sexual relations with him, I knew unconditionally with all my heart that I was going to marry him. I knew we were going to be married, and I can't tell you anything more about it, but I knew it, and it was true.''

 █ This is an equity case and we are charged with the duty and responsibility of weighing the evidence. We will state frankly that we are not impressed that we should give full faith and credit to this evidence. It was also shown that while plaintiffs' mother testified on this trial that Klepper was always very fond of and devoted to her children, treating them with love and affection at all times, yet in the trial of the suit against him for separate maintenance brought soon after their separation, she testified that he was always kind to the girl, ''but the boy he disliked—extremely so;'' that there seemed to be something in the boy that was repulsive to him, and that he told her he tolerated the boy's acts of affection only because pleasing to her.

We do not have Klepper's evidence as to this alleged contract of adoption, but all the evidence is that he was a man of scrupulous honesty, careful in contracting obligations, and discharged all his obligations faithfully. When he separated from plaintiffs' mother the girl was about of age, eighteen, and the boy two years younger. He continued to support the mother by voluntarily paying her regularly $100 per month. The children completely dropped out of his life and evidently he did not consider them as his adopted children with the obligations imposed by that relationship. He could not testify but his actions speak for him. Shortly after the separation he instituted a suit for divorce. Plaintiffs' mother promptly filed a motion for an allowance for support and attorney's fees *pendente lite,* which was allowed and paid, though plaintiff, Klepper, dismissed his suit without trial. Nothing was said in that suit about adopted children or their custody or support. Then plaintiffs' mother filed her suit for separate maintenance, which was tried, and the court awarded her $225 per month permanent support. Plaintiffs' mother did not ask and nothing was given for support of his adopted children and nothing was said as to their custody, though the mother was supporting them. On entering the allowance for support of the wife, the court said:

''Now, gentlemen, this morning, in my preliminary remarks before determining the amount, in those remarks I might have used expressions which would seem to indicate that I was allowing a certain sum to support the children of the plaintiff by a former marriage. Of course, that is not my intention, because there is no obligation on the part of the defendant to support the children of the plaintiff by her former marriage. I merely used those words meaning the

children by a former marriage, so as to explain that that was in my mind in determining the situation of the plaintiff, both at the time of the marriage and during the marriage and at the present time, and as one of the elements to take into consideration in determining how large an amount in her situation in life, as she appears to be, it would require to support her, and her alone, not the support of the children.''

No objections were made to this statement and it shows that no contention was made as to the custody of the children or that these plaintiffs were entitled to support as adopted children, but, on the contrary, plaintiffs' mother was proceeding on the theory that she alone was entitled to an allowance for support and maintenance. After Klepper paid the allowance for her support for about four years, plaintiffs' mother concluded that she would rather have a lump sum as alimony rather than have Klepper pay her the monthly allowance, and in June, 1918, filed her suit for divorce and alimony, making no claim, however, for the support of her children, and by agreement made a property settlement with Klepper by which she accepted $15,000 in cash as alimony in gross, which was paid on the divorce being granted on the ground of desertion. Plaintiffs' mother agreed to and did execute a release reciting:

''In consideration of the sum of Fifteen Thousand Dollars ($15,-000.00) to me, the undersigned, in hand paid by Harry I. Klepper, my former husband, I do hereby forever acquit and discharge the said Harry I. Klepper from any and all claims, demands, judgments, allowances, alimony, or marital rights of whatsoever kind; and do agree that any and all present and future property of said Harry I. Klepper, as also his estate after his demise, shall be free and clear of any and all claims of maintenance, dower, absolute allowance, allowance in lieu of provisions, or any other marital or other rights whatsoever, as fully, in all respects, as if no married relation had at any time existed between us.''

This release was signed and duly acknowledged by Ola E. Klepper. She also executed quitclaim deeds covering all his real estate.

Of course, these court proceedings, the releases and the money paid for support of the wife, though made as she said for the benefit and support of her and the children, are not legally binding on the children and are not a bar to this action, but we think they do show that neither plaintiffs' mother nor Klepper considered that plaintiffs were his adopted children and heirs. It takes no judicial eye to discern that the mother is the prime mover and actor in the present proceedings and it discredits her to know that she, while ostensibly releasing him of all obligations growing out of her matrimonial relations with him, was but lying in wait, unless this suit was an afterthought, to despoil him, for the benefit of her children, of his entire estate at his death.

Another fact or series of facts clearly show, we think, that Klepper was not conscious of having adopted these plaintiffs as his children and heirs. It was shown that Klepper in 1909, during the life of his first wife, made a will giving, without noting details, all his property to her for life with power to use the *corpus* and at her death to go in equal shares to his brother and sisters. When the first wife died, he added a codicil thereto reciting that fact and giving his property to his brother and sisters for life with remainder to their heirs. In March, 1912, a year and a half after his marriage to Mrs. Ola George, plaintiffs' mother, he again changed his will by adding a codicil thereto which recites ''my recent marriage makes necessary'' and which further recites:

''Having married since the foregoing will and codicils were executed, it is now my will that my wife Ola Klepper shall take and receive out of my estate such part thereof as by law she would be entitled to take at the time of my death were I to die intestate, and the remainder of my estate I dispose of in accordance with and as provided by the foregoing will and codicils thereto.''

This will makes no mention of or provision for any adopted children, though he was fully aware that he had a new wife and provided for her. He certainly did not consider that he had also acquired two children by adoption. At the time this will was drawn these plaintiffs were living with and being supported by Klepper. According to plaintiffs' evidence, it was at a time when Klepper was living in perfect harmony with them and their mother during the second year of this marriage. There is no reason why Klepper should disinherit them if adopted, and if he ever considered plaintiffs his adopted children, he certainly did so at that time. Then in 1925, after his last wife, plaintiffs' mother, had secured a divorce and alimony in gross and had made the release of all his property, he took the old will with its codicils to his friend and advisor and had him draw a new will, which is the one in controversy. This will was drawn by Fred G. Zeibig, a real estate man and long-time business friend of Klepper, and he is one of the trustees. He knew of Klepper's second marriage, separation and divorce, and knew of these two children of his last wife whom he supported and educated. He says Klepper had talked about these stepchildren but never mentioned adopting them or mentioned them in connection with the will which he dictated.

The evidence further shows that Klepper never disclosed to his sisters, some of whom he visited frequently, and to other intimate friends of his, his having adopted these children or agreeing to do so. The plaintiffs themselves do not claim to have known anything about the adoption contract and did not by their evidence support their allegation in the petition that they entered and lived in the home of Klepper with the understanding and in the belief that they

were adopted children. They clearly greatly profited by what Klepper did for them in affording them a home, educating and rearing them with privileges and advantages hardly possible for their mother to have given them. For this they should be truly grateful and it is hard to believe that any great fraud will be perpetrated or injury done them by denying their right to inherit Klepper's estate. In any event, the evidence does not convince us with that certainty and freedom from doubt necessary in cases of this kind to remove the ban of the Statute of Frauds and justify us in granting the relief prayed for. [Barnett v. Clark (Mo.), 252 S. W. 625; Lamb v. Feehan (Mo.), 276 S. W. 71.]

The judgment of the trial court is, therefore, reversed. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur.