ADOLPH FURMAN and HARRY FURMAN, Appellants, v. ST. LOUIS UNION TRUST COMPANY, a Corporation, and ALLEN C. ORRICK, Executors and Trustees of the Estate of HUGH CAMPBELL, for HAZLETT KYLE CAMPBELL; HAZLETT KYLE CAMPBELL, BELLEFONTAINE CEMETERY ASSOCIATION, a Corporation; MARY BOERSTE, AUGUST H. MEYER, AUGUST HERMAN MEYER, Trustee of ADOLPH FURMAN and HARRY FURMAN Under the Will of HUGH CAMPBELL; FRANK HAVINATTI and the Unknown Living Children and Heirs of MRS. BETTIE OTEY ANDERSON, and YALE UNIVERSITY, a Corporation, et al.—92 S. W. (2d) 726.

Division Two, March 21, 1936.

Harry Felberbaum and Jesse T. Friday for appellants.

*Charles Nagel, Daniel N. Kirby* and *Harry W. Kroeger* for St. Louis Union Trust Company and Allen C. Orrick, Executors and Trustees of the will of Hugh Campbell; *Frank H. Fisse* for Mary Boerste, August H. Meyer and Frank Havinatti.

*Leahy, Saunders & Walther, Harry Troll* and *W. W. Henderson* for Anton P. Schuler, Guardian of the person and estate of Hazlett Kyle Campbell, a *non compos,* corespondent.

*Jacob M.* and *Arthur V. Lashly* for Yale University.

WESTHUES, C.—Appellants filed suit in the Circuit Court of the City of St. Louis, seeking specific performance of an alleged oral contract of adoption, alleged to have been made by Hugh Campbell, deceased. The trial court denied the relief prayed for and appellants appealed. Appellants contend that the trial court erred in denying the relief prayed for, while respondents contend that the evidence was insufficient to support an oral adoption. We are of the opinion that respondents are correct in their contention. We will attempt to state the facts as briefly as the circumstances permit and to make such comments in connection therewith as we deem appropriate.

Hugh Campbell, the deceased, alleged maker of the oral contract of adoption, was a descendant of one of the early pioneers. His father was born in Ireland. One of deceased's brothers, named Alexander, graduated from Yale College in 1882, but died many years ago. The other brother, Hazlett Kyle Campbell, was living at the time of the trial, but for many years had been an invalid and also mentally infirm. Hugh Campbell's father, who became immensely wealthy, erected a beautiful home at 1508 Locust Street, St. Louis, Missouri. This constituted the family residence and the residence of Hugh Campbell and his afflicted brother up to the time of the death of Hugh Campbell. The evidence shows deceased to have been a man of rare talents, highly educated, cultured, honorable and a lover of the finer things in life, such as music, art and good literature. He was of the aristocratic type, dignified in manner and proud of his ancestry. Nature had endowed him with excellent health, a fine physique and a friendly, sociable disposition. In addition to

the education acquired in school and through reading he had in his early years traveled extensively. He had never married and his estate was appraised to be worth over a million dollars. The invalid brother lived at the family home with deceased. In the natural growth of the city the well-to-do moved away from the ever growing industrial center to better environments. The deceased remained in the family residence and during his last thirty years or more devoted practically all of his time in an endeavor to make the life of his afflicted brother as comfortable as possible. Trustworthy servants were employed, who remained in his service many years. They lived together as a happy family. The pleasures of travel and social life were sacrificed by deceased that he might give his personal attention to the wants of his brother. Dr. MacIvor, a Presbyterian minister, who was regarded as Campbell's pastor, testified he suggested to deceased that he was allowing his devotion to his brother to exclude him from society, etc., "but he held steadfast in his purpose, feeling that this was his mission, his privilege and his duty." As the years passed, the neighborhood surrounding the Campbell home was made up of the very poorest of the city. Deceased became intersted in charity work. The first to receive his aid, as shown by the record, was Father Dunn's Newsboys' Home. From the year 1906, to the time of his death the newsboys' home was one of deceased's pet charities. He aided this institution materially in a financial way, and also provided outings and Christmas and other parties for the boys of the home. He often visited them and for many years kept his identity a secret. He even threatened to withdraw his aid to the home if any publicity was given to his charity work. During these years the deceased furnished what was necessary to enable a number of individual boys, who were especially underprivileged, to acquire an education. He took particular pride in aiding boys who were ambitious to acquire an education. He furnished the means for a number to study music and was delighted when success was attained.

His attention was also attracted by the poor people in the neighborhood. A family by the name of Bornstein lived across the street from the Campbell residence. The father was a tailor by trade, but was unable to properly support the family, which consisted of a wife and four children at that time and later six children. The deceased for many years furnished this family with groceries and clothing. All of the children were aided in a financial way to obtain an education. The youngest of these children, named Joe, seemed to be a special favorite of Mr. Campbell. He personally took this boy and entered him in school. The principal testified: "Tears came to Mr. Campbell's eyes when he left the boy at school and mentioned that he would be awful lonesome without him." It was shown by the evidence that the boy visited the Campbell home daily. On one

occasion, when the weather was very cold, deceased observed a small colored boy, dressed in rags, standing on a street corner selling papers. Mr. Campbell took him to a store and purchased him an entire outfit from cap to shoes. On many occasions he would take vast numbers of children to a nearby store and purchase ice cream or candy for them. His charity work consisted of more than mere financial aid. He gave it his personal attention, which added much to the happiness of the recipients as well as to his own. The Campbell yard was used as a playground and the home was open to many of the poor children in the neighborhood. These children must indeed have believed in a Santa Claus, for they had one in their midst three hundred and sixty-five days of the year.

We could go on and give many other instances and circumstances of deceased's works of charity, as disclosed by the record. We believe enough has been said to picture the background or the setting of the stage upon which the drama was played, which gave rise to this lawsuit and in which the plaintiffs, by accident, played an important part.

Appellants, plaintiffs below, were: Harry Furman, born February, 1906, and Adolph Furman, born July, 1907. In the year 1911, they were living in the Campbell neighborhood. During that year the father deserted the family and from thence on never aided them in any way, if in fact he ever did so. In the year 1912, the mother obtained a divorce from the father and also obtained custody of the boys. In August of that year she married one Sawyer. Sawyer, however, was not an asset, but rather a liability. Plaintiffs' mother attempted to earn a livelihood. She was employed as a scrubwoman at a furniture store. Plaintiffs were then about five and six years of age. During the day they played about the streets and were always very poorly clad and hungry. The deceased noticed them and made inquiry about their circumstances. He thereupon made arrangements with a nearby restaurant where they could obtain their meals. He also furnished them with clothing and paid their expenses at school. The boys often visited at the Campbell home where they were always welcome, and deceased grew very fond of them. Their mother died July 22, 1920, and deceased paid for the funeral expenses. The plaintiffs being without a home the deceased made arrangements with an aunt to take care of them. Later this was changed and another aunt kept the boys. Still later another change was made and a Mrs. Decker furnished a home for the boys. During all these years the deceased paid for their keeping and furnished them clothing and spending money. He also hired a music instructor for them and the lessons were given at the Campbell home. They became interested in various sports and were expert swimmers. In other words the deceased furnished plaintiffs with all the necessities of life in a rather extravagant manner.

The evidence introduced by appellants, which they claim supports an oral adoption, is: First, that Mr. Campbell always referred to plaintiffs as ''my boys;'' second, that by his conduct, that is the personal attention given to plaintiffs, he indicated that he intended to adopt them; third, a number of witnesses testified that Mr. Campbell had informed them that he was going to adopt the boys and had obtained their mother's consent so to do. We will discuss this evidence under the points indicated.

It was an admitted fact at the trial that Mr. Campbell referred to the plaintiffs as ''my boys.'' Defendants' as well as plaintiffs' witnesses so testified. It was shown that the deceased referred to many of the children to whom he had rendered special aid as ''my children'' or ''my boys,'' etc. Especially was this true of little Joe Bornstein. This little chap was first taken to Campbell's yard and home when but a few weeks old and thereafter was always a daily visitor. Whenever the deceased referred to this boy it was always as ''my little Joe,'' etc. In view of the circumstances the trial court evidently did not, as we do not, consider this evidence of much significance.

And so to with reference to the evidence as to the personal attention that was given to the plaintiffs by the deceased. The record discloses that plaintiffs were the only children on deceased's charity list in that neighborhood who were without parents and were, therefore, in need of special attention. The evidence shows that Mr. Campbell did nothing half way. Whatever he undertook to do he did thoroughly. He often accompanied plaintiffs to the stores and personally supervised the purchasing of their clothing. He also personally looked after the progress made by the boys in their music, school work and athletics. He expressed his gratification freely whenever success was evident. Mr. Campbell also manifested like interest in other boys whom he had aided in obtaining success. The interest Mr. Campbell evidenced in the Furman boys was manifested without change from the time he undertook to supply their needs to the time of his death. The plaintiffs received more personal attention from deceased than many other children because plaintiffs did not have parents to supply such attention.

Now as to the evidence with reference to alleged statements, made by the deceased, of the existence of an oral contract to adopt. Ben Furman, the father of plaintiffs, testified in their behalf. It may not be amiss to state that the witness deserted the plaintiffs when they were in great need. He left them to be supported by their mother, who was unable to properly do so, resulting in plaintiffs being half clothed and hungry and the objects of charity. All through these years we do not hear a word of this witness, the father, as to any help that he gave to the plaintiffs, but note his testimony. After

the mother's death, which fact he learned accidentally, through a newspaper, he went to see Mr. Campbell, who had been the benefactor of his sons, and this is what happened at this meeting as per his evidence abstracted by appellants.

"The reason I went to the Campbell home on that occasion, I went there to see if the boys were taken care of. Well, I came back there to get the boys; the fact of the matter is that I wanted to take them home to live with us." . . .

"I think it was the dining room, and I introduced myself to him and shook hands with him. The first thing I asked him was how the boys were, and he told me. He wanted to know what I wanted with them, and I told him that I wanted to take them home with me. He says, 'They are my boys,' he says, 'I promised their mother I would take care of them and give them everything in the world they wanted. I would adopt them and when I die, they could have everything I had left.' So I says, 'Now, Mr. Campbell, I have heard how you have been doing wonderful for the boys, and I know you can do it, and I am sure glad, because I know you have done more for them than I could have done, and I know you can do more for them than I ever could do for them, or ever will be able to do,' and he grasped me by the hand and was just as happy as he could be about it. He said if I took the boys away from him it would kill him. Just at that time this Gus Meyer, I think his name is, he came in and when he come in Mr. Campbell introduced him to me, and he says to Mr. Meyer, 'This is the father of my boys,' and I shook hands, and we talked a little, just what about I don't remember except about how the boys were getting along, how good they were, etc., and Mr. Campbell got hold of me on this side of me and this Gus Meyer on the other side of me and we walked back into the yard, and there was some niggers near the side of the alley, standing there, I guess there was about three or four of them any way, and Mr. Campbell had his arm around me, and he waved to the niggers, and he says, 'This is the father of my boys,' and when he said that, it pretty near killed me. I couldn't keep from crying, hardly."

We can visualize the pitiful scene of this father, who deserted his sons in their infancy being moved to tears on hearing the benefactor of the sons refer to them as "my boys." Such testimony is hard to believe. Gus Meyer, mentioned in the testimony of Furman, had been the trusted servant of Mr. Hugh Campbell for a quarter of a century. He testified as a witness that such an event as detailed by Furman never occurred. Another witness, who testified she was present when Furman visited the deceased on that occasion, stated that no such conversation occurred as related by Furman. On the contrary Furman is alleged to have stated to Campbell that he, Fur-

man, had married a second time and was unable to care for the boys. Which of the two versions is in harmony with the previous conduct of the witness? Without further comment we dismiss the evidence of Furman, for it fails to make an impression.

Mrs. Birdie Roberts, a witness for plaintiffs, testified she was a clerk at Famous-Barr; that she first met Mr. Campbell about the year 1914, when he came to the store with plaintiffs the first time and bought clothing for them. She further testified:

"In referring to the boys or in talking about them he referred to them always as 'my boys,' and he would say, 'These boys give me so much pleasure, Miss Birdie, and I don't know what I would do if it wasn't for these boys.' After I had waited on him about a year, I said, 'Mr. Campbell, are these really your boys?' And he said, 'No, they are not my boys; but some day they are going to be my boys.' Later on in years, about three years or so later, he spoke to me; 'Miss Birdie,' he says, 'I am going to adopt these boys when their mother permits me to.' He says, 'These boys are everything I have and I want them to be mine.'

"Q. And did he ever tell you about the mother giving permission or anything like that? A. Yes, and then he came in later on and said that their mother had consented to the adoption and he was going to adopt the boys, and seemed to be very much elated about it."

On cross-examination, when asked if Mr. Gus Meyer was present, the witness stated that he was near, but did not hear the statements made because Mr. Campbell whispered to her or spoke in a very low tone. This witness also testified that she usually waited on Mr. Campbell when he came to purchase clothing for plaintiffs and that she considered him one of her special customers.

Another witness, Mrs. Laura Beal, also a clerk at Famous-Barr, testified:

"After that first time that I waited on Mr. Campbell and the Furman boys, I continued to wait on them as long as I was in the Famous-Barr service. I continued to wait on them all the period of time from the time they were seven or eight years old, until they went into long-pants suits. They were then about fifteen or sixteen years old. . . .

"Q. Now, then, did Mr. Campbell ever talk to you about the boys? A. Well, I had been waiting on him for about two years when he said to me one day that he was very unhappy, and I asked him why, and he said, 'Well, that he had loved these boys, and he wanted to adopt them but that their mother didn't want it,' and I said, 'Well, I can see her point, because you know, I was the mother of four children and I wouldn't want to give them away,' I says to him, and he says that he is in a position to give them a good

schooling and educate them in music, and give them anything they wanted, which their mother couldn't, and that he didn't want her to lose any of her health; that he wanted them to sleep with her and be at her house at night, but through the day he said he wanted them because they gave him a lot of pleasure. . . .

"Q. Did he ever again talk to you about adopting these boys, what his intention was in that regard? A. Well, he came in about a year later and he told me that he had gained the consent of their mother and that he was going to adopt them as his own boys."

This witness further testified that she began waiting on Mr. Campbell in the year 1914, when he first bought clothing for appellants. Note her testimony:

"That would be four times a year. He would always come to me. That was from 1914 to 1922. I am the one that always waited on him. Nobody else waited on him. He always wanted me; he asked for Mrs. Beal. . . .

"Q. If you were away on your vacation wouldn't he have someone else wait on him when he came in? A. If I was away he would never let anyone wait on him; he would come back. If I was gone he would come back when I would be there a week or so later.

"I was the only one that waited on him as long as I was employed there. My memory is clean and clear on that."

The conflict in the evidence of the last two named witnesses is obvious. Does it not also seem strange that Mr. Campbell should whisper to the saleslady of the store when he is alleged to have imparted the information concerning the adoption? We may comment in passing that these two witnesses remembered too well the minute details of what transpired between them and a customer of the store fifteen years prior to the trial. We view the evidence with suspicion.

The two aunts of appellants, with whom they boarded as per arrangements made by deceased, testified for appellants. Their testimony was, that on various occasions when they went to the Campbell residence to collect what money was due them for boarding plaintiffs, Mr. Campbell mentioned that he was going to adopt the boys. One of these witnesses testified that when Mr. Campbell terminated the arrangement with her sister, she was sent for and asked to take charge of them. She relates a part of the conversation had with Mr. Campbell as follows:

" 'Aunt Laura, I suppose you have had related to you what took place between Adolph and Harry and Aunt Mildred,' and I said 'Yes' that I had. He says, 'I don't want anyone to slap my boys. They are my boys, and if there is any correcting to be done I will do the correcting because I promised their mother that if she would let the boys be a comfort and companion to me in the future as they have been in the past I am going to adopt them and I mean

to do it.' I says, 'All right, Mr. Campbell, I will do as you wish.' ''

The alleged statement of deceased, as contained in the above testimony, is the only reference made in the entire record as to any consideration for the alleged promise of adoption. We do not desire to be facetious, but we ask, did that promise, if in fact made, mean anything more than that if the boys, plaintiffs, would continue to be the recipients of the generous aid so lavishly bestowed upon them by the deceased and if they would continue to demonstrate their appreciation therefor then deceased would adopt them? Without pausing to decide whether the consideration mentioned was sufficient to support an oral contract to adopt we pass on to a more serious question, namely, was the evidence related sufficient under the uniform rulings in cases of this nature to justify a court of equity to decree specific performance? We think not.

█ The evidence disclosed that in the Campbell home there were at least three bedrooms completely furnished, but never occupied. It was in evidence that plaintiffs did not spend one night at the Campbell home. Had the deceased promised the mother of plaintiffs that he would adopt them, would it not have been reasonable to suppose that at her death they would have been taken into the home? Again let us see what Mr. Campbell did after the mother died, in July, 1920. A short time thereafter, November 13, 1920, Mr. Campbell added a codicil to his will leaving the sum of $15,000 in trust for each of the plaintiffs. They to have the income therefrom until each should reach the age of twenty-eight years. Is it not evident from that act that the deceased never intended to adopt the boys but merely desired to insure, in case of his death, that plaintiffs would complete their education and prepare themselves for life's battle? It must also be remembered that the mother of plaintiffs at no time surrendered custody of the boys to the deceased. She did not forego any right possessed by a parent. The acts and conduct of the deceased were inconsistent with the theory that he at any time entertained the thought of adopting plaintiffs as his children. The following quotation from Wales v. Holden, 209 Mo. 552, 108 S. W. 89, l. c. 96, is appropriate to this case:

''When a court of equity is invoked to enforce an oral contract void under the Statute of Frauds on the ground of part performance, it recognizes and appreciates the danger that the statute was designed to avoid, and grants relief only when it is sure, beyond a reasonable doubt, that to refuse its aid would result in allowing the statute to be made in that case an instrument to protect fraud. A court of equity therefore requires that a part performance relied on to take the case out of the statute should be of a character, not only consistent with the reasonable presumption that *what was done*

*was done on the faith of such a contract, but also. that it would be unreasonable to presume that it was done on any other theory.''*
(Italics ours.)

The rule of law followed in cases of this character is thus stated in Grantham v. Gossett, 182 Mo. 651, 81 S. W. 895, 1. c. 899:

"In all the cases of this kind that have come before this court we have held that, to sustain the alleged oral contract, the proof must be so clear, cogent, and convincing as to leave no reasonable doubt in the mind of the chancellor, not only that a contract of the general nature alleged was made, but that the particular contract as alleged was made, and its terms and conditions clearly shown.''

This rule has been steadfastly adhered to by this court. Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S. W. (2d) 827; Bland v. Buoy, 74 S. W. (2d) 612, 335 Mo. 967; Ahern v. Matthews, 337 Mo. 362, 85 S. W. (2d) 377; Shelp v. Mercantile Trust Co., 15 S. W. (2d) 818, 322 Mo. 682.

If the wisdom of the rule be doubted, cases of this nature should remove such doubt, as noted by the Kansas City Court of Appeals in Buck v. Meyer, 195 Mo. App. 287, 190 S. W. 997, 1. c. 998 (2):

"Courts must be very careful not to lower the standard of proof in such cases, for, if that standard be lowered or weakened, the danger of unfounded and trumped-up claims being established. against a person after his death is very great.''

Note a few of the cases cited by appellants. In each the party seeking enforcement of an oral adoption contract was taken into the home of the adopter, custody was transferred and parental authority was surrendered to the adopter. No such facts appear in the case before us. The cases referred to are: Lynn v. Hockaday, 61 S. W. 885, 162 Mo. 111; Fisher v. Davidson, 195 S. W. 1024, 271 Mo. 195; Johnson v. Antry, 5 S. W. (2d) 405; Eldred v. Glenn, 52 S. W. (2d) 35; Carlin v. Bacon, 16 S. W. (2d) 46, 322 Mo. 435; Taylor v. Coberly, 38 S. W. (2d) 1055, 327 Mo. 940.

The case of Shepherd v. Murphy, 61 S. W. (2d) 746, 332 Mo. 1176, while not in point here, may be read with interest to note the effect of a legal adoption as now prescribed by our statute. Briefly stated that case holds that an adoption, under the statute, means a complete separation from the natural parents or other custodian and a transfusion into the adopting family. So much so that the natural parents cannot inherit from the child adopted by another.

The decree entered by the trial court was the only one that was justified by the evidence. To have decreed otherwise would have been a warning to the well to do—be ye not too charitable lest the objects of your charity, after your death, establish themselves as your legal heirs. Charity, as evidenced in this case, should be encouraged, not discouraged.

Appellants contend that the trial court erred in admitting evidence, introduced by respondents, contradicting the evidence of appellants tending to prove statements made by the deceased. The rule invoked will be found in a case cited by appellants. [Pursifull v. Pursifull, 257 S. W. 117, l. c. 118.] That rule is, that self-serving statements of a deceased will not be admitted to disprove an established oral contract. We have no quarrel to find with that rule. It, however, does not apply to this case. Respondents' evidence, which is here questioned, did not consist of proof of self-serving statements, but was evidence tending to show that the statements of the deceased, with reference to an oral promise of adoption, were in fact not made. It is evident that the rule does not apply. It is also argued by appellants that positive evidence is of more value than negative evidence. However, a negative fact may be proven by negative evidence. [Nall v. Brennan, 324 Mo. 565, 23 S. W. (2d) 1053, l. c. 1056, 1057 (2, 3).]

It is also urged that the evidence of respondents, showing deceased's manner of treatment of other recipients of his charity, was erroneously admitted. It is essential that a court of equity should be acquainted with the surrounding circumstances, the situation of the parties, and habits of life, etc., to intelligently interpret the meaning and effect of their acts, conduct and statements, which, as in this case might be attributed to the deceased person for the purpose of establishing a contract. The evidence objected to was, therefore, not only admissible but highly important to a proper understanding of the case. Such evidence has always been admitted. [Kidd v. St. Louis Union Trust Co., 335 Mo. 1029, 74 S. W. (2d) 827, l. c. 832 (4); Wales v. Holden, supra; Arfstrum v. Baker, 214 S. W. 859, l. c. 860 (3, 4).]

The judgment is affirmed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.